Charles PARLIMENT and Lyn Parliment, Appellants/Cross–Appellees,

v.

YUKON FLATS SCHOOL DISTRICT, Appellee/Cross–Appellant.

Nos. S–2191, S–2239.

Supreme Court of Alaska.

Aug. 26, 1988.

Rehearing Denied Oct. 25, 1988.

---

Edward A. Merdes, D. Randall Ensminger, Fairbanks, for appellants/cross-appellees.

D. Kenneth Ford, Jermain, Dunnagan & Owens, Anchorage, for appellee/cross-appellant.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

Charles Parliment sued Yukon Flats School District (hereinafter "Yukon Flats" or "the district") for breach of an employment contract and for breach of a subsidiary agreement involving water hauling services. The superior court awarded Parliment partial relief on both claims. We reverse.

## I

### A. *Employment Contract*

During the 1982–83 school year, two schools operated in Venetie, Alaska. Yukon Flats operated a high school (grades 9–12) and a federal agency, the Bureau of Indian Affairs (BIA), operated an elementary level day school (grades K–8). There were plans to transfer the BIA school to the state system, but a transfer date had not been determined.

Lyn and Charles Parliment were hired by the BIA as teachers for the 1982–83 school year. Mrs. Parliment was assigned grades K–3, and Mr. Parliment was assigned grades 4–6. Charles Sutton, the BIA principal, taught grades 7–8.

When the Parliments were hired, members of the BIA represented to them that a transfer to the state system was imminent, and that, when this occurred, the Parliments would be transferred as well. At a community meeting in October, 1982, these representations were confirmed by the Yukon Flats superintendent, Beatriz Apodaca, who assured the Parliments that they would be employed by her school district, provided they met certain conditions. These conditions were (1) that the Parliments receive a favorable recommendation from the local school board, (2) that there be a transfer of the BIA school to Yukon Flats, (3) that there be vacancies at the time of the transfer, and (4) that the Parli-

ments be BIA employees when the transfer occurred.[1]

Sutton resigned as principal at the BIA school in February 1983, and Mr. Parliment assumed his teaching responsibilities for the 7th and 8th grades. Before Sutton left, he recommended that the BIA not renew Mr. Parliment's contract for the following year. On April 18, 1983, Parliment received a non-retention notice from James Wiegand, the BIA superintendent of education.[2] His non-retention was based on charges of misconduct involving, *inter alia*, unauthorized absences and theft of government property.

Parliment appealed his non-retention by means of a letter to Wiegand. Parliment received a response on May 27, 1983, upholding the decision to terminate him, and the termination was made effective June 6, 1983. Shortly after receipt of this decision, the Parliments began an unsuccessful search for other work. Mr. Parliment performed no teaching services at the Venetie Day School following the effective date of his termination.

Between the end of the 1982–83 school year and the beginning of the 1983–84 school year, the BIA transferred grades 7–8 to Yukon Flats. The vacant teaching position was filled by an in-house applicant in the Yukon Flats School District.[3] Parliment was not considered for the position.[4] Mrs. Parliment, based upon her husband's non-retention, declined to accept a BIA teaching contract for the 1983–84 school year.

In February 1984, Parliment's case was reopened by Dennis Fox, Assistant Director of Agencies, Office of Indian Education Programs, who corrected a procedural error in the non-retention process. Fox, however, upheld Parliment's termination on the merits.[5] Fox's decision was, in turn, affirmed by a BIA hearing officer in May 1984. The hearing officer recommended, however, that the effective date of the termination be changed from June 6, 1983, to February 23, 1984, the date upon which the procedural error was corrected. The BIA adopted the hearing officer's recommendation, and ordered that Parliment be paid for this additional period of time.

### B. *Water Hauling Claim*

While the BIA and Yukon Flats co-existed in Venetie, there was an agreement between the two schools regarding an exchange of water for electricity. Earl Henry, a BIA maintenance person, was responsible for hauling water from the river to storage tanks which supplied water to both schools through a connecting transfer system.[6] Yukon Flats, in turn, supplied electricity to the BIA.

In the winter of 1982–83, sub-zero temperatures rendered the BIA water system inoperable. As a result, no water was provided to Yukon Flats for several weeks. Yukon Flats' principal, Gregg Gassman, threatened to cut off the BIA's supply of electricity unless water was supplied as agreed. When Gassman approached Parliment about hauling water, Parliment informed Gassman that he would not supply water without compensation.[7] After this

1. Both Mr. and Mrs. Parliment testified that it was their understanding that employment with the BIA at the time of the transfer was a prerequisite to their being hired by Yukon Flats.

2. The BIA school board voted to renew Parliment's contract, but this recommendation was rejected by Wiegand because of timeliness and a conflict of interest on the board.

3. In-house applicants were given priority for vacant teaching positions pursuant to a negotiation agreement between Yukon Flats and the local teachers union.

4. Parliment contends that his application was initially considered for this position, but when Yukon Flats personnel called the BIA, they were

notified of his termination and, consequently, he was not hired.

5. BIA procedure required that the deciding official in a non-retention case be a higher official than the one who proposed the discharge. Since Wiegand proposed Parliment's removal, the correct procedure was not followed until Parliment's case was heard by Fox.

6. Earl Henry testified that Parliment helped him haul water from the time Parliment began teaching in Venetie until April 1983.

7. Both parties testified that Gassman told Parliment that he would have to ask the Yukon Flats school board for compensation. In July 1984, Parliment submitted a bill to Yukon Flats for his services.

conversation, Parliment did supply water to Yukon Flats, and Yukon Flats continued to supply electricity to the BIA.

### C. *Proceedings Below*

The Parliments instituted this suit in superior court on December 30, 1985, claiming that the Yukon Flats School District breached its promise to hire Mr. Parliment at the time the BIA transferred its school to Yukon Flats. Included in this suit was a claim by Parliment for compensation for services he performed on the district's water system.

Following a bench trial, the court determined that Superintendent Apodaca, by words or conduct, represented to the Parliments that they would be hired by Yukon Flats, provided that the four above mentioned conditions were met. The court concluded that the Parliments had, in fact, received a favorable recommendation from the school board, that there was a transfer of grades 7–8 at the commencement of the 1983–84 school year, and that this transfer created a vacancy on the Yukon Flats teaching staff. The court further found that Mr. Parliment was teaching grades 7–8 at the end of the 1982–83 school year.

In determining whether Parliment was a BIA employee at the time of the transfer, the court apparently relied upon the BIA hearing officer's decision, which changed the effective date of Parliment's termination to February 23, 1984. The court, thus, concluded that Yukon Flats should have hired Parliment at the commencement of the 1983–84 school year. The court further concluded, however, that Yukon Flats was not required to continue Parliment's employment beyond February 23, 1984. Accordingly, the court held Yukon Flats liable for back pay from September 1983 to February 1984.[8] As to the water hauling claim, the court found Yukon Flats liable to Parliment under theories of "quantum meruit or ... actual contract."

The Parliments appeal, claiming that the damages awarded by the court on the employment contract were insufficient. They seek back-pay to the present time and reinstatement with Yukon Flats. The district cross-appeals, arguing that the trial court erred in finding it liable to the Parliments for either breach of employment contract or for the value of Parliment's water hauling services.

## II

### A. *The Employment Contract*

■ We consider first whether the trial court erred in finding Yukon Flats liable for breach of its promise to hire Parliment.

As a general rule, when a party's performance is subject to a condition precedent, that party's duty to perform arises only if the condition is met or excused. *Klondike Industries v. Gibson,* 741 P.2d 1161, 1165 (Alaska 1987); *see also Norton v. Herron,* 677 P.2d 877, 882 (Alaska 1984).

In this case, the trial court found, and the parties do not disagree, that Parliment's employment by the BIA at the time of the transfer was a condition precedent to the district's promise to employ him. *See Peterson v. Wirum,* 625 P.2d 866, 873 (Alaska 1981) (courts generally reluctant to give effect to conditions precedent unless clearly stated). The trial court further found that the BIA transferred the operation of its school to Yukon Flats after Parliment was given his final notice of termination at the end of the 1982–83 school year, effective June 6, 1983.[9] Mrs. Parliment was not a BIA employee because she failed to renew her contract for the 1983–84 school year. Therefore, when the transfer occurred, neither of the Parliments were employed by the BIA. The trial court, however, concluded that Parli-

---

8. Damages of $9,298 were calculated based on Mr. Parliment's estimated salary with Yukon Flats, less compensation received from the BIA between September and February 1984. Mrs. Parliment was also awarded derivative damages for foregoing a BIA teaching contract for 1983–

84 as a result of the district's alleged breach of promise.

9. AS 14.03.020 defines the academic school year as the first day of July through the 30th day of June.

ment *was* a BIA employee at the time of transfer. We reverse.[10]

Parliment argued below that, because the BIA later changed his official termination date from June 6, 1983, to February 23, 1984, he was technically still employed by the BIA at the time of the transfer. In support of this argument, Parliment relies on our decision in *Aleutian Region R.E.A.A. v. Wolansky*, 630 P.2d 529 (Alaska 1981), wherein we determined that a wrongfully terminated teacher who "should have been retained" when his school district was absorbed by another district was entitled to be reinstated by the new district pursuant to AS 14.20.147(a).[11] *Id.* at 532. Parliment claims that the same interpretation should apply in this case. He argues that since the BIA's original termination date was procedurally incorrect, he should have been employed by the BIA at the time of the transfer. Applying *Wolansky*, he claims to have met all of the conditions precedent to the district's promise.

We think this case is distinguishable from *Wolansky* in two ways. First, Parliment's non-retention was ultimately upheld on the merits, whereas Wolansky's termination was found to be wrongful and void *ab initio. Id.* at 532. Consequently, Parliment was not a teacher who "should have been retained," as was Wolansky. The fact that Parliment's termination date was subsequently changed to correct the harm caused by a procedural error in the BIA's termination process has no real relevance to Parliment's present contract claim. His employment was terminated on June 6, 1983, a decision that was later affirmed on the merits, and he has not worked for the BIA since that time. We conclude that the original non-retention decision, which was in effect at the time of the transfer, is controlling in the case at bar.

The second distinction between the instant case and *Wolansky* is that, in *Wolansky*, we expressly denied recovery of the very damages the superior court granted to Parliment below, namely, back pay from the transferee school district for the period between the transferor school district's termination of the employee and the date upon which the termination was determined to be wrongful. *See id.* at 531–32. We concluded that, at least under the statutory scheme at issue in *Wolansky*, it was the transferor district, against whom the wrongful termination decision was rendered, which should bear the costs of back pay. *Id.* at 532.[12] A similar rationale may be applied in the case at bar. Any damages to which Parliment may be entitled based upon his alleged wrongful termination must, we believe, be sought from the BIA rather than from Yukon Flats.

We conclude, therefore, that the correct termination date *for purposes of this suit* is June 6, 1983. Mr. Parliment was not employed by the BIA, nor should he have been, when the BIA transferred the 7th and 8th grades to Yukon Flats in 1983–84. Accordingly, the trial court's judgment for breach of contract must be reversed.[13]

---

**10.** Since Mrs. Parliment's damages were derived solely from the superior court's finding that the district breached her husband's employment contract, her damages must also fail.

**11.** AS 14.20.147(a) gives teachers a statutory right to be hired by an absorbing district when the transferring districts are both within the State of Alaska school system. AS 14.20.147(b), on the other hand, deals with transfers between federal agencies and state operated school districts, and requires a mutual agreement between the absorbing district and the teacher before the right to transfer is invoked. Parliment's appeal is not based on a statutory right to transfer under subsection (b), but is based on this court's interpretation of a teacher's retained status in wrongful termination cases.

**12.** More specifically, we concluded in *Wolansky* that damages awarded in connection with the wrongful termination claim were properly considered part of the "remaining debts" of the *transferor* school district under a statutory provision mandating state assumption of such debts following transfer. *Id.* at 532.

**13.** In light of our conclusion that no duty ever arose under Yukon Flats' promise, we need not address the promissory estoppel question. Since all of the conditions precedent to Yukon Flats' promise were not met, the Parliments could not have reasonably relied on that promise to their detriment.

### B. *The Water Hauling Claim*

Parliment's second claim is based on his demand for compensation from Yukon Flats for hauling water. The trial court found that, after the conversation between Parliment and Gassman, Yukon Flats was aware that Parliment expected to be paid for his services. The court concluded that recovery for these services was justified "[e]ither on the basis of quantum meruit or an actual contract."

We dismiss the latter theory of liability. Parliment's attorney expressly conceded the contract issue at trial, stating: "We have not found any evidence of an actual contract as pled in count four. We are proceeding on the quantum meruit theory." [14]

The theory of quantum meruit, like all theories of quasi-contract,[15] is based on the inequity of allowing a defendant to be unjustly enriched. *See Alaska Sales & Service v. Millet*, 735 P.2d 743, 746 (Alaska 1987). We have established three essential elements to a quasi-contract claim: (1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation by the defendant of such a benefit, and (3) acceptance and retention by the defendant of the benefit under circumstances making it inequitable for him to retain the same without paying for it. *Id.*

In this case, the first two elements are undoubtedly satisfied. Parliment clearly conferred a benefit on Yukon Flats by hauling water, and Yukon Flats does not dispute the fact that it willingly received and appreciated these services. The remaining question is whether it would be unjust to allow the district to retain this benefit without paying for it. As we stated in *Alaska Sales & Service*, "[w]here a defendant has given fair consideration or value to a third party in exchange for the benefits conferred by the plaintiff, there is no windfall and no recovery will lie." *Id.*

We agree with Yukon Flats' contention that it was not unjustly enriched, since it paid fair consideration for the services in question by continuing to supply electricity to the BIA school. In reaching this conclusion, we are persuaded by the fact that the practice of hauling water existed throughout the time both schools existed in Venetie.[16] Parliment's demand for compensation did not change the terms of the agreement found by the trial court to have existed between the two schools; water was still exchanged for electricity. Gassman's threat to cut off the BIA's electricity unless water was supplied as agreed is further evidence of the district's understanding that water was to be provided as a *quid pro quo* for the electricity supplied by Yukon Flats. We conclude that Yukon Flats was not unjustly enriched by the benefit conferred upon it by Parliment. Accordingly, the superior court's finding on this issue is reversed.

### III

For the foregoing reasons, we REVERSE both the order awarding damages to the Parliments for breach of an employment contract and the order awarding damages in connection with the water hauling arrangement. We REMAND for a redetermination of attorney's fees in light of this opinion.

---

**14.** Our own review of the record convinces us that the contract claim is, in any event, unsupported by the evidence.

**15.** Courts generally treat actions brought upon the theories of unjust enrichment, quasi-contract, contracts implied in law and quantum meruit as essentially the same. *Alaska Sales & Service v. Millet*, 735 P.2d 743, 746 n. 6 (Alaska 1987).

**16.** John Erik, the BIA maintenance person who preceded Earl Henry, stated in his deposition that, from 1979 to 1983, one of his responsibilities was hauling water in the BIA water truck.