**OLD HARBOR NATIVE CORPORATION, and Akhiok–Kaguyak, Inc., Appellants,**

v.

**AFOGNAK JOINT VENTURE, Appellee.**

No. S–9484.

Supreme Court of Alaska.

Sept. 7, 2001.

Rehearing Denied Nov. 2, 2001.

---

Matthew D. Jamin, Jamin, Ebell, Schmitt & Mason, Kodiak, and Walter W. Mason, Jamin, Ebell, Schmitt & Mason, Seattle, WA, for Appellant.

Robert J. Sato, Middleton & Timme, P.C., Anchorage, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Old Harbor and Akhiok–Kaguyak appeal from a grant of summary judgment to Afognak Joint Venture on claims arising from damages paid to the Joint Venture resulting from the EXXON VALDEZ oil spill, and the contemporaneous withdrawal of Old Harbor and Akhiok–Kaguyak from the Joint Venture. Because there are issues of material fact regarding Old Harbor's and Akhiok–Kaguyak's claims and because the Joint Venture was not entitled to judgment as a matter of law, we reverse the order granting summary judgment.

## II. FACTS AND PROCEEDINGS

Thirteen Alaska Native corporations, organized under Alaska law pursuant to the Alaska Native Claims Settlement Act,[1] entered into a joint venture to receive a conveyance of land from the federal government under the Alaska National Interest Lands Conservation Act (ANILCA).[2] ANILCA required that the corporations form a joint venture to

---

1. 43 U.S.C. §§ 1601–1629(a) (1971).

2. Pub.L. No. 96–487 (1980) (codified in scattered sections of 16 U.S.C. and 43 U.S.C.).

receive the land.[3] The corporations, including Old Harbor Native Corporation and Akhiok–Kaguyak, Inc. (individually Old Harbor and Akhiok; collectively the Corporations), formed the Afognak Joint Venture (Joint Venture) in 1982. The detailed joint venture agreement (agreement) contained provisions on the ownership structure of the Joint Venture, management, and withdrawal procedures. Under the terms of the agreement, Old Harbor held a 12.38% interest and Akhiok held a 5.99% interest.

On March 24, 1989, the oil tanker EXXON VALDEZ ran aground in Prince William Sound. During April and May of 1989 the spill oiled portions of Afognak Island, including lands held by the Joint Venture.

On April 21, 1989, Old Harbor gave the Joint Venture notice of its withdrawal under Exhibit C to the agreement. Akhiok gave notice of its withdrawal on April 28, 1989. Under the terms of the agreement, the Corporations immediately relinquished membership in the Joint Venture by serving their written notices of withdrawal.

In July 1991 the Corporations and the Joint Venture reached a partition agreement, and all parties executed a release of claims arising from the agreement. As a part of the settlement agreement, Old Harbor paid the Joint Venture $128,941 and Akhiok paid $62,429 as their shares of the Joint Venture's negative value.[4]

The Joint Venture joined a tort lawsuit against Exxon and other defendants for damages resulting from the 1989 spill (the Exxon claim). In September 1993 the Joint Venture asserted claims on behalf of its members and included claims for the damage done to the lands partitioned to the Corporations.

The following month Exxon co-defendant Alyeska Pipeline Service Company agreed to settle claims made against it in the case;

under the settlement, Alyeska paid $98 million to a fund compensating Exxon plaintiffs in September 1994. Exxon separately established a claims program, which eventually paid approximately $224 million to private plaintiffs. Co-defendant Trans Alaska Pipeline Liability Fund also paid about $41.7 million to plaintiffs. In addition, in September 1994 a federal jury awarded plaintiffs $5 billion in punitive damages against Exxon. In 1996 the Joint Venture valued its share of the combined Exxon claim, including punitive damages, at about $22 million.

The Corporations brought suit against the Joint Venture in September 1997, alleging multiple causes of action resulting from the Joint Venture's refusal to partition the Exxon claim. The Joint Venture moved for summary judgment, and the Corporations cross-moved for summary judgment. The superior court granted the Joint Venture's motion on all of the Corporations' causes of action. The Corporations appeal.

## III. DISCUSSION

### A. Standard of Review

We review appeals from summary judgment de novo and will uphold an order granting summary judgment when the record shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[5] Contract interpretation is a matter of law for which we use our independent judgment.[6]

### B. The Settlement Agreement and Release Do Not Bar the Corporations' Claims.

The Joint Venture and the Corporations executed an agreement partitioning the Joint Venture's lands and a release relinquishing all claims between the parties in July 1991.[7] The Joint Venture asserts that the release, which covered all claims arising

---

**3.** Pub.L. No. 96–487 § 1427(c) (1980).

**4.** The valuation of the Joint Venture for purposes of withdrawal excluded "commercial timber, land and value of improvements." The values included here are without interest.

**5.** See *Ellingstad v. State, Dep't of Natural Resources,* 979 P.2d 1000, 1004 (Alaska 1999).

**6.** See *Alaska Energy Auth. v. Fairmont Ins. Co.,* 845 P.2d 420, 421 (Alaska 1993).

**7.** The release provided in relevant part:

Section 2. *Release by [Akhiok].* [Akhiok] acknowledges that the execution and delivery by the [Joint Venture] of the materials and documents listed ... above completely and satisfactorily fulfills all of [the Joint Venture's] obligations

from the agreement, bars all of the Corporations' claims, including the Joint Venture's claims for oil spill damages. The Corporations respond that the settlement agreement did not cover the Exxon claim, that the Joint Venture's breach of its fiduciary duty of disclosure invalidates the release, or that the release should be reformed.

The superior court heavily relied upon the settlement agreement and release in granting summary judgment to the Joint Venture. The court concluded:

> (1) The settlement agreement and release cover all claims arising out of the division of assets and land upon withdrawal from the [Joint Venture]. The [Exxon] claim, like any other asset, is covered by the settlement agreement and release and the plaintiffs are not entitled to any portion of that claim.
>
> (2) ... [The Corporations] released any breach of contract claim that may arise from the accounting they were furnished.

Although the superior court decision did not expressly address what duty the Joint Venture owed to the Corporations after their withdrawal but prior to the completion of the partitioning and winding-up process, it assumed that the Joint Venture did not owe a duty of disclosure regarding the Exxon claim. The superior court also found that the evidence did not support reformation of the settlement agreement and release.

We have previously reviewed the effect of language releasing contracting parties from all claims between those parties in *Martech Construction Co. v. Ogden Environmental Services, Inc.*[8] There, we stated that "[t]he

broad language used [in the release] implies that claims not specifically contemplated are settled" and applied the release to Ogden's post-settlement conduct.[9]

■ The Joint Venture cites *Martech Construction* for support of its argument; and its reliance on *Martech* might be well-placed if the legal issue were a question of interpreting the breadth of the settlement agreement and release. But that is not the relevant inquiry here. The Corporations allege that the settlement agreement and release should be voided because the Joint Venture breached a fiduciary duty of disclosure. They argue alternatively that the settlement agreement and release should be reformed because of a mutual mistake of fact regarding the Exxon claim. These claims challenge the validity and effectiveness of the release agreement, not its scope—the issue that *Martech* addresses. Settlement agreements and releases are contracts; as such, they are susceptible to attack under the legal theories of mistake,[10] fraud,[11] and misrepresentation.[12] Therefore, the effectiveness of the settlement agreement and release must be analyzed in light of the Corporations' claims, even if the Joint Venture correctly characterizes the scope that the release would have if it were determined to be valid as originally written.

C. *The Joint Venture Breached Its Fiduciary Duty to Disclose the Status of the Exxon Claim During the Partitioning.*

■ The Corporations assert that the Joint Venture owed them a fiduciary duty of

---

to [Akhiok] contained in (i) the Settlement Agreement and (ii) Exhibit C to the [Joint Venture] Agreement except those obligations contained in Section 2 of the Settlement Agreement. [Akhiok] hereby releases and discharges the [Joint Venture], each individual member of the [Joint Venture], its manager, and its forester appointed pursuant to Exhibit C to the [Joint Venture] Agreement, from any other or further obligation, claim or liability ("Claims") under (i) the [Joint Venture] Agreement, including but not limited to Exhibit C thereof; [and] (ii) the Settlement Agreement except Section 2; ... whether such Claims are currently known or subsequently discovered or are different in character or extent than currently known.... [Akhiok] acknowledges that it is aware of and understands the rulings of the Alaska Supreme Court regarding

releases ..., and it remains its intention to release the above described Claims.

Section 3. *Release by [Old Harbor].* [The release language is virtually identical to Section 2 with Old Harbor replacing Akhiok].

**8.** 852 P.2d 1146, 1150–52 (Alaska 1993).

**9.** *Id.* at 1152.

**10.** *See Witt v. Watkins,* 579 P.2d 1065, 1067–68 (Alaska 1978).

**11.** *See id.*

**12.** *See Diagnostic Imaging Ctr. Assocs. v. H & P,* 815 P.2d 865, 867–68 (Alaska 1991).

disclosure regarding the Exxon oil spill claim and that the Joint Venture's duty survived the Corporations' withdrawal from the Joint Venture. The Corporations' argument is persuasive.

■ Joint venturers owe each other a fiduciary duty during the existence of the venture.[13] We have previously held that a joint venturer may breach a duty it owed during the term of the venture even after the venture has expired.[14] In *Ahtna, Inc. v. Ebasco Constructors, Inc.*, Ebasco argued that its fiduciary duty to file a timely claim for compensation on Ahtna's behalf was extinguished at the end of the business venture.[15] We called that argument "misplaced," holding that if the *"obligation ...* arose during the term of the [joint venture], it matters not that Ebasco's *breach* occurred after the [joint venture] expired."[16]

■ We have not previously decided whether members of a dissolving joint venture continue to owe each other a fiduciary's duty of disclosure from the moment of dissolution through the time when the venture finally winds up its affairs.[17] We hold now that they do.

■ The process of ending a joint venture relationship only begins with dissolution. At that point, the parties no longer pursue business interests as one entity. But withdrawal of a member or some other dissolution-triggering event does not end the relationship among the joint venturers because the process of winding up includes the accounting and division of the venture's assets and debts. During the winding up, joint venturers continue to owe a fiduciary duty to each other until the process is complete.[18] This duty is especially relevant with respect to the disposition or management of joint venture assets.[19]

Here then, the Joint Venture owed the Corporations a duty of disclosure during the period from the Corporations' withdrawal in April 1989 until the settlement agreement and release were executed in July 1991. During that time, while the Joint Venture and the Corporations were negotiating over the partitioning of land to the Corporations, the Joint Venture stood in the position of a trustee with respect to the venture's assets because the Corporations were no longer members of the joint venture but were joint owners of the assets. The Corporations were entitled to an accounting under the agreement, as the Joint Venture acknowledges; but the Corporations were also entitled to disclosure of significant events and management decisions affecting the unpartitioned assets.

The facts of this case illustrate the need to hold joint venturers to a fiduciary's duty of disclosure during the entire dissolution process: here the process of accounting and partitioning the land took over two years to complete. To end the Joint Venture's fiduciary obligation at the moment of dissolution would invite complacency and sharp dealing

---

13. *See National Soil Servs., Inc. v. Hurst*, 630 P.2d 3, 7 (Alaska 1981).

14. *See Ahtna, Inc. v. Ebasco Constructors, Inc.*, 894 P.2d 657, 663 (Alaska 1995).

15. *See id.*

16. *Id.*

17. The trial court did not make a finding of fact regarding the date of accrual of the Exxon claim, therefore, it is impossible to determine from the record presented on appeal whether a fiduciary duty of disclosure arose during the term of the venture-as was the case in *Ahtna*.

18. *See In re S & D Foods, Inc.*, 144 B.R. 121, 160 (D.Colo.1992) ("fiduciary obligations continue after dissolution of a partnership or joint venture and until all partnership or joint venture affairs are completely wound-up"); *Leff v. Gunter*, 33 Cal.3d 508, 189 Cal.Rptr. 377, 658 P.2d 740, 744 (1983); *Larry Karchmar, Ltd. v. Nevoral*, 302 Ill.App.3d 951, 236 Ill.Dec. 378, 707 N.E.2d 223, 227 (1999) (holding joint venturer owes fiduciary duty to former joint venturer until profits distributed); *Greenberg v. Alter Co.*, 255 Iowa 899, 124 N.W.2d 438, 440 (1963) ("joint venturers like partners owe the duty of finest loyalty and such loyalty continues throughout the life of the venture and its dissolution"); *accord Lavin v. Ehrlich*, 80 Misc.2d 247, 363 N.Y.S.2d 50, 52 (N.Y.App.1974) (holding partner owes fiduciary duty "in dealings effecting the winding up of the partnership and the proper preservation of partnership assets during that time").

19. *See Karchmar*, 236 Ill.Dec. 378, 707 N.E.2d at 227; *Fravega v. Security Sav. & Loan Ass'n*, 192 N.J.Super. 213, 469 A.2d 531, 536 (Ch.Div.1983).

during the process of partitioning and accounting.[20]

In sum, the Joint Venture owed the Corporations a fiduciary's duty of disclosure regarding the status of Joint Venture assets—including the Exxon claim—during the period following the Corporations' withdrawal but prior to the completion of the partitioning process. Accordingly, unless the record conclusively establishes that the Joint Venture discharged its fiduciary duty, the Joint Venture was not entitled to summary judgment on the Corporations' causes of action for misrepresentation and unjust enrichment.

■ The Corporations claim that the Joint Venture's silence in the face of its affirmative duty to disclose the status of the Exxon claim amounts to misrepresentation. The superior court held that there was no evidence that the Corporations justifiably relied on the Joint Venture's "alleged representations (or silence)." But the superior court's decision applied the wrong standard. Where, as here, one party has an affirmative duty to disclose information material to a transaction, that party's silence will generally not support summary judgment.[21]

■ The Corporations also claim that the Joint Venture was unjustly enriched by its retention of the entire Exxon claim. The superior court held that because "unjust enrichment is not in and of itself a theory of recovery" and the Corporations had "no viable cause of action," their unjust enrichment claim failed. The Corporations' challenge of this ruling has merit.

■■ We recently stated:

The general principle of the doctrine of unjust enrichment is that "one person

should not be permitted unjustly to enrich himself at [the] expense of another, but should be required to make restitution of or for property or benefits received, retained or appropriated." As its definition indicates, the doctrine of unjust enrichment is predicated on the theory of restitution: When a party unjustly receives, retains, or appropriates property or a benefit, the party should repay the source of the property or benefit.[22]

And we have also made it clear that we will "generally treat actions brought upon the theories of unjust enrichment, quasi-contract, contracts implied in law and quantum meruit as essentially the same." [23]

Here, the Corporations claimed that they had superior rights to their proportionate interests in the Exxon claim. And by presenting evidence that the Joint Venture received and retained the Corporations' proportionate interests in the Exxon claim, that the Joint Venture was aware of these interests, and that the Joint Venture's retention of the interests could be considered unjust, the Corporations raised a material issue of fact as to whether the Joint Venture was unjustly enriched.[24] Given this factual dispute, summary judgment should not have been granted to the Joint Venture on the cause of action for unjust enrichment.[25]

D. *There Is a Genuine Issue of Material Fact as to Whether the Parties Made a Mutual Mistake of Fact.*

■ The Corporations also assert that they presented evidence establishing a material issue of fact as to whether both parties made a mutual mistake regarding the Exxon

---

**20.** See *Wirum & Cash, Architects v. Cash,* 837 P.2d 692, 701 (Alaska 1992) (fiduciaries owe duty of full disclosure).

**21.** See *Turnbull v. LaRose,* 702 P.2d 1331, 1334–35 (Alaska 1985).

**22.** *Anderson v. Tuboscope Vetco, Inc.,* 9 P.3d 1013, 1019 (Alaska 2000) (quoting *Black's Law Dictionary* 1535 (6th ed.1990)).

**23.** *Parliment v. Yukon Flats Sch. Dist.,* 760 P.2d 513, 518 n. 15 (Alaska 1988).

**24.** See *Alaska Sales & Serv., Inc. v. Millet,* 735 P.2d 743, 746 (Alaska 1987); *see generally* IV

George E. Palmer, *The Law of Restitution* § 21.5 (1978).

**25.** We note that the Corporations' cause of action for unjust enrichment arguably should have survived summary judgment even under the superior court's analysis because it is undisputed that the Joint Venture's valuation of its land for purposes of partitioning did not adjust the valuations for the partitioned parcels due to the damage incurred as a result of the EXXON VALDEZ spill. *See* Restatement of Restitution § 125(2) (1937).

claim's absence from the settlement agreement. A mutual mistake of this kind, according to the Corporations, would have justified reformation of the settlement agreement and release. The Corporations' argument is persuasive.

■ In order to reform a contract because of a mutual mistake, the party urging reformation must show: "(1) the mistake relates to a 'basic assumption on which the contract was made,' (2) the mistake has a material effect on the agreed exchange of performances, and (3) the party seeking relief does not bear the risk of the mistake." [26]

The first prong of this test requires that the mistake be related to a basic assumption on which the contract was made. In *Stormont v. Astoria, Ltd.,* we held that a mistake regarding "assumptions . . . [that] went to the heart of the contract[ ]" satisfied this requirement.[27] There, the issue was whether acknowledged mistakes about the extent of a building's deterioration were central to a sales contract between a commercial seller and buyer. Noting that the property "was listed as 'income property,' and [the buyer] was interested in it for its rental value" we held the mistake related to a basic assumption of the contract.[28]

Here, the settlement agreement, by its own terms, purported to "resolve all of the [Joint Venture] and [the Corporations'] rights arising from [the Corporations'] withdrawal from the [Joint Venture]"; yet it failed to mention the Exxon claim. The Joint Venture admits that "[t]he parties did not address this issue in the Settlement Agreement or during settlement discussions," and that it "never specifically considered the effect of the Settlement Agreement on the [Joint Venture's] [Exxon] claim." By contrast, Old Harbor presented evidence that

it expected, as early as February 8, 1990, to receive its approximately twelve percent interest of the Exxon claim. And Akhiok's attorney attested that "[a]t no time [during the settlement negotiations] did anyone from the [Joint Venture] advise us that the [Joint Venture] intended to claim and retain for itself" the Exxon claim.

The settlement agreement purported to settle all claims, yet it failed to address or account for the allocation of a significant Joint Venture asset. This situation leads us to conclude that the mistake that the Corporations allege as a basis for reformation relates to a basic assumption of the settlement agreement.

The second prong of the mutual mistake test requires that the mistake be material to the transaction. We discussed this requirement in *Diagnostic Imaging Center Associates v. H & P,* where we held that an undisclosed profit of $45,000 in a transaction between partners "cannot be immaterial." [29] By comparison, the Joint Venture stood to gain more than $22 million from the partial settlement of the Exxon claim-of which Old Harbor and Akhiok claim 12.38% and 5.99%, respectively. This amount is certainly material to a transaction in which Akhiok paid $62,429 and Old Harbor paid $128,941 to the Joint Venture as their shares of the Joint Venture's purported *negative* value.

■ Finally, nothing in the settlement agreement transferred the risk of a *mutual* mistake to the Corporations—the third prong of the mutual mistake test. Therefore, the evidence, when viewed in the light most favorable to the Corporations, supports the contention that the Corporations and the Joint Venture made a mutual mistake as to the effect the settlement agreement had on the Exxon claim.[30]

26. *Stormont v. Astoria Ltd.,* 889 P.2d 1059, 1061 (Alaska 1995) (quoting Restatement (Second) of Contracts § 152 cmt. a (1981)).

27. *Id.*

28. *Id.*

29. 815 P.2d 865, 867 (Alaska 1991).

30. The Joint Venture's legal position on summary judgment is untenable with regard to the

Exxon claim: it alternatively argues that the Exxon claim was an asset of the Joint Venture but that it did not owe a duty of disclosure to the Corporations-a theory we dismissed above; or that the Exxon claim was not an asset of the Joint Venture because the agreement set the date of accounting as the last day of the month preceding withdrawal. If we were to accept the Joint Venture's logic, there would be a period of almost a month during which the Corporations were members of the Joint Venture and were

## IV. CONCLUSION

The Joint Venture owed the Corporations a fiduciary duty to disclose the status of the Exxon claim after the Corporations' withdrawal from the Joint Venture. Because the record fails to establish that the Joint Venture met this duty, the superior court erred in granting summary judgment to the Joint Venture. Additionally, there is an issue of material fact regarding whether both parties made a mutual mistake of fact with respect to the settlement agreement and release's failure to address the Exxon claim. We therefore REVERSE the order granting summary judgment to the Joint Venture and REMAND for further proceedings.[31]

responsible for the venture's debts, but not entitled to share in the venture's assets. Such an outcome is not consonant with Alaska partnership law. *See* AS 32.05.030; *see generally Winther v. Samuelson*, 10 P.3d 1167, 1171 (Alaska 2000) (recognizing that "partnership property is a type of ownership").

31. The Joint Venture and the Corporations both claim to have owned the Afognak Island land at the time the Exxon claim accrued: the Corporations claim that they held as tenants in common with the other joint venturers, and the Joint Venture claims that it held as the sole title holder under ANILCA. Both parties rely on their asserted ownership interests as the keystone of their legal arguments. We find it unnecessary to reach these conflicting claims of ownership in light of our holding in this case.