**AFOGNAK JOINT VENTURE, Appellant,**

v.

**OLD HARBOR NATIVE CORP.,
and Akhiok–Kaguyak, Inc.,
Appellees.**

**No. S–11912.**

Supreme Court of Alaska.

Jan. 26, 2007.

---

R. Collin Middleton and Robert J. Sato, Middleton & Timme, P.C., Anchorage, for Appellant.

Matthew D. Jamin, Matthew R. St. John, and Karen L. Lambert, Jamin Schmitt St. John, Kodiak, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

This is the second appeal in a dispute between various Kodiak area Native corporations over ownership of claims resulting from the *Exxon Valdez* oil spill. The Old Harbor and Akhiok–Kaguyak corporations belonged to a joint venture, along with eleven other corporations, which they formed in order to receive land on Afognak Island from the federal government. Old Harbor and Akhiok withdrew from the joint venture shortly after the *Exxon Valdez* oil spill of March 24, 1989. Upon withdrawal, they received shares of joint venture land and paid their shares of the joint venture's debts in satisfaction of all claims against the joint venture. In the 1990s the remaining members of the joint venture claimed oil spill settlement funds, including funds for damage to the land partitioned to Old Harbor and Akhiok, which the joint venture then refused to share with Old Harbor and Akhiok. The two corporations sued the joint venture to recover a proportionate share of the Exxon claim. The supe-

rior court ruled in favor of Old Harbor and Akhiok. The joint venture appeals.

Because the superior court correctly determined ownership of the Exxon claim and correctly awarded a share of the Exxon claim to Old Harbor and Akhiok, and because the joint venture's remaining arguments are without merit, we affirm the superior court's judgment that the Exxon claims should be divided between the parties. We remand to the superior court for that division.

## II. FACTS AND PROCEEDINGS

### A. Events leading up to *Old Harbor I*[1]

Thirteen Kodiak-area Native Corporations ("joint venturers") formed the Afognak Joint Venture ("Joint Venture" or "AJV") in 1982 in order to receive lands from the federal government, as provided in Public Law 96–487 § 1427(c) (1980):

> The Secretary of the Interior shall convey the surface estate on Afognak Island [as defined in an earlier section] ... to a joint venture providing for the development of the surface estate.... The conveyance shall be made as soon as practicable after there has been filed with the Secretary of the Interior a duly executed joint venture agreement with provisions for sharing of and entitlements in costs and revenues of such venture as provided in this subsection [so that each corporation's land share is based on its population and acreage]. The conveyance shall not indicate the respective interests of each of the corporations in the surface estate conveyed but such interests shall be as provided in this subsection which shall be incorporated by reference into the conveyance.

One of the joint venturers, Afognak Native Corporation, managed the Joint Venture. According to the Joint Venture agreement, the Joint Venture had several purposes: to receive the lands from the federal government, to develop them in the best interests of the joint venturers, and to manage fish and wildlife as required by the conveyance. The Joint Venture agreement indicated that the joint venturers intended to own the property as tenants in common and not as partners.

---

1. *Old Harbor Native Corp. v. Afognak Joint Ven-* *ture,* 30 P.3d 101 (Alaska 2001) (*Old Harbor I*).

However the Joint Venture, rather than the individual venturers, had authority to sell Joint Venture property and to determine when to distribute revenue to the venturers.

The oil tanker *Exxon Valdez* hit Bligh Reef on March 24, 1989, spilling eleven million gallons of oil into the North Pacific; some of this oil reached Joint Venture land at some time between March 31, 1989 and the end of the summer of 1990. In April 1989 Akhiok–Kaguyak Corporation and Old Harbor Native Corporation (the Corporations) gave notice of their withdrawal from the Joint Venture. At the time of their withdrawal, the Corporations owned an undivided 18.37% interest in both the land and net assets of the Joint Venture (Old Harbor owned 12.38% and Akhiok owned 5.99%). According to the Joint Venture agreement, the Corporations immediately ceased to be members of the Joint Venture when they gave notice of their withdrawal; their land share was calculated according to values on the dates of their withdrawals and their shares of Joint Venture net assets were calculated from the last day of the month immediately preceding their withdrawal, i.e., March 31, 1989.

The parties negotiated a partition of land and assets and a release, which they signed in July 1991. The release indicates that the partition agreement "completely and satisfactorily fulfills all of [the Joint Venture's] obligations" to the Corporations, including the accounting and payment required in § 6.01 of Exhibit C to the Joint Venture agreement: "The Joint Venture shall be obligated to pay to the withdrawing joint venturer its percentage interest in the net assets [of the Joint Venture] within one year of the date of the notice of withdrawal...." The net assets of the Joint Venture "are the assets less the liabilities of the Joint Venture excluding commercial timber, land and value of improvements computed on an accrual basis." As part of the settlement and release, Old Har-

bor paid $128,941 and Akhiok paid $62,429 as their shares of the Joint Venture's negative value.[2]

The Joint Venture applied for Exxon spill settlement funds in 1993 from Alyeska Pipeline Service Company and later from Exxon, funds that included amounts based on the land already ceded to the Corporations. The Corporations requested a proportionate share of the settlement in 1996, but the Joint Venture denied the request. Other members of the Joint Venture who withdrew after the Joint Venture filed its Exxon claims were to receive shares of the oil spill damage claims based on their respective ownership interests in the Joint Venture. The Corporations sued the Joint Venture in September 1997, claiming a portion of the Exxon claims.[3] The superior court granted summary judgment to the Joint Venture based on the release, and the Corporations appealed.[4]

### B. Summary of *Old Harbor I*

In *Old Harbor I* we reversed the superior court's grant of summary judgment to the Joint Venture and remanded the case for further proceedings.[5] In *Old Harbor I* we held that the members of the Joint Venture continued to owe each other a fiduciary duty during the period between the Corporations' withdrawal in late April 1989 and the partition in July 1991. During that time, we held, "the Joint Venture stood in the position of a trustee with respect to the Venture's assets because the Corporations were no longer members of the Joint Venture but were joint owners of the assets."[6] The Joint Venture's fiduciary duty included a duty of disclosure regarding the status of the Exxon claim.[7] We also held that there was a genuine issue of material fact as to whether the parties made a mutual mistake of fact when they omitted the Exxon claim from the accounting of the Joint Venture's assets during the partition.[8]

---

2. *Id.* at 104.

3. *Id.*

4. *Id.*

5. *Id.*

6. *Id.* at 106.

7. *Id.* at 107.

8. *Id.* at 107–08.

■ The three elements of mutual mistake of fact meriting reformation are: (1) the mistake relates to a basic assumption of the contract; (2) the mistake has a material effect on the agreed exchange; and (3) the party seeking relief does not bear the risk of mistake.[9] Regarding the first element, we concluded that the alleged mistake related to a basic assumption of the contract, since the settlement agreement's goal was to "resolve all of the [Joint Venture] and [the Corporations'] rights arising from [the Corporations'] withdrawal from the Joint Venture," which included rights to the Exxon claim.[10] For the second element, we concluded that the mistake was material to the transaction.[11] For the third, we stated that "nothing in the settlement agreement transferred the risk of a *mutual* mistake to the Corporations...."[12] Since we were reviewing summary judgment to the Joint Venture, we viewed all the evidence in the light most favorable to the Corporations. That included Old Harbor's evidence that it expected as early as February 1990 to receive about twelve percent of the Exxon claim and Akhiok's evidence that the Joint Venture never informed it during the partition negotiations that it intended to retain all of the Exxon claims.[13]

In *Old Harbor I* we noted that the trial court had not made a finding of fact regarding the date of accrual of the Exxon claim.[14] Therefore, it was impossible to determine whether the Joint Venture's duty to disclose the Exxon claim arose before or after the Corporations' withdrawal from the Joint Venture. However, we held that regardless of when the Exxon claim arose, the Joint Venture's fiduciary duty of disclosure continued until partition, and the Joint Venture had a duty to inform the Corporations of the status of the claim.[15] We also noted that in light of this holding we did not need to resolve a further factual conflict between the

parties: They both claimed to own the land at the time the claims accrued, the Corporations as tenants in common with other joint venturers, and the Joint Venture as sole title holder.[16]

Consequently, the questions for the superior court on remand were: (1) Given the existence of a duty to disclose the status of the Exxon claim up until the July 1991 partition, did the Joint Venture discharge it? (2) Given the parties' failure to address the Exxon claim in the partition agreement, did the parties make a mutual mistake of fact meriting reformation of the agreement?

**C. Summary of Proceedings in the Superior Court**

After remand from *Old Harbor I* and before trial, the parties stipulated to several facts, including the following:

No oil from the Exxon Valdez Oil Spill contacted AJV land on or before March 31, 1989, because the oil had not yet reached the Kodiak Island Group.

For the AJV lands that were oiled, the vast amount of the oil was not present by the end of the summer of 1990.

During a bench trial before Superior Court Judge Sen K. Tan, the parties presented live testimony from ten witnesses, and submitted depositions from eight witnesses, and introduced approximately 370 exhibits. The superior court found that the Joint Venture members held the land as tenants in common. The superior court also relied upon our observation in *Old Harbor I* that, although the Corporations ceased to be members of the Joint Venture upon notice of withdrawal, they continued to own interests in Joint Venture land and other assets.[17]

The superior court found that, although "the parties did not think about the [Exxon]

9. *Id.* at 108 (quoting *Stormont v. Astoria Ltd.*, 889 P.2d 1059, 1061 (Alaska 1995)).

10. *Id.*

11. *Id.* The Joint Venture valued its share of the Exxon claims, including punitive damages, at about $22 million. *Id.* at 104.

12. *Id.* at 108 (emphasis in original).

13. *Id.*

14. *Id.* at 106 n. 17.

15. *Id.* at 106.

16. *Id.* at 109 n. 31.

17. *See id.* at 106.

claim in the context of the partition discussions and the documents that finalized their agreement, they were certainly aware of a potential oil spill damage claim" during the period between withdrawal and partition. The court also found that the parties knew that the Joint Venture was an absent class member in the Exxon suit, although the parties dispute whether the Joint Venture found out about its class membership before partition.[18] Finally, the court found that within a year of the Corporations' withdrawal, the Afognak Native Corporation (whose managers were the same people managing the Joint Venture) demonstrated that it felt its own land damage claim had value by participating in discovery with other class attorneys and modifying its direct action claims against Exxon to include damages for "the direct oiling" of its land. (The Afognak Native Corporation had originally claimed damage only to archaeological sites during oil-spill cleanup.)

The superior court noted that "[t]he [Exxon] oil spill case extended the notions of damages that could be recovered." This was because land owners such as the Joint Venture were not required to show actual damage. Under the distribution plans of both the Alyeska and Exxon settlements, a claimant's land was valued on the day of the oil spill (March 24, 1989), and its value before the spill was compared to its value after the spill on that day. Using March 24 as the date for assessing damage was simply a convenience, since "any distribution plan tying recoveries to when a property was actually first oiled would have been an administrative nightmare." Additionally, a landowner did not have to show that its land had actually

been oiled; the land only had to be located within the "oil spill area," which included all of Afognak Island.[19] Thus a landowner claim such as the Joint Venture's had only two elements: ownership of the land on March 24, 1989 and location in the oil spill area.

The superior court applied the three-part mistake of fact test set out in *Old Harbor I,* and concluded that the parties made a mutual mistake of fact "in not realizing ... the existence of the oil spill damages claim [during the partition negotiations]." Holding that this mistake merited "reformation" of the settlement agreement, the superior court awarded 18.37% of the Exxon claim to the Corporations. In light of this ruling, the superior court did not reach the issue of breach of fiduciary duty.

The Joint Venture now appeals.

## III. STANDARD OF REVIEW

 We review the superior court's factual findings for clear error.[20] We will find clear error only if, after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made.[21]

 Questions of contract interpretation are generally questions of law which we review *de novo;* but fact questions are created when the meaning of contract language is dependent on conflicting extrinsic evidence.[22] We can affirm a decision of the superior court on any basis supported by the record.[23] Finally, unless a factual or legal error by the superior court is "inconsistent with substantial justice," the court's judgment will not be disturbed.[24]

---

18. In February 1991, six months before the parties signed the partition agreement, Superior Court Judge Brian Shortell certified a class of real property owners affected by the spill, which included the Joint Venture land. Old Harbor represented the class.

19. In 1994 the U.S. District Court required as an element of recovery that oil actually reached a property owner's land. However, neither the Alyeska settlement nor the Exxon settlement required this, in Alyeska's case because it pre-dated the district court's order, and in Exxon's because the parties settled and the court later approved a distribution plan like Alyeska's.

20. Alaska R. Civ. P. 52(a).

21. *Hall v. TWS, Inc.,* 113 P.3d 1207, 1210 (Alaska 2005).

22. *Norville v. Carr–Gottstein Foods Co.,* 84 P.3d 996, 1000 n. 1 (Alaska 2004).

23. *Hall,* 113 P.3d at 1210 (citing *Rausch v. Devine,* 80 P.3d 733, 737 (Alaska 2003)).

24. Alaska R. Civ. P. 61. *See also Fairbanks North Star Borough v. Rogers & Babler,* 747 P.2d 528, 531 (Alaska 1987) ("[E]ven if a finding of fact or conclusion of law is erroneous, the mistake is not grounds for reversal if the finding or conclusion is not necessary to the court's ultimate decision.").

## IV. DISCUSSION

### A. The Superior Court Did Not Err when It Determined that the Corporations Owned a Portion of the Exxon Claim.

■ The Joint Venture asserts that the superior court's judgment should be reversed because it is based on the incorrect assumption that *Old Harbor I* decided who owned the land and who owned the claims. The Joint Venture argues that because of this incorrect assumption the superior court's decision lacks adequate factual support. In response, the Corporations maintain that ownership of the Exxon claim is irrelevant to the superior court's decision, since the mutual mistake the parties made was "in failing to discuss and allocate the Exxon claim even though the parties were operating under an implicit and explicit assumption that all the parties' rights would be resolved."

Under Article VI, § 6.01 of Exhibit C to the Joint Venture agreement, the Joint Venture is required to account for its net assets "on an accrual basis" as of the last day of the month preceding the date of withdrawal. Because the withdrawal was in April, the accounting date was therefore March 31, 1989. Under the agreement, the Joint Venture is required to pay the withdrawing corporation the corporation's percentage interest in the Joint Venture's net assets within a year of notice of withdrawal plus eighteen percent interest. According to the Joint Venture, the Exxon claims accrued to the Joint Venture after the Corporations' withdrawal. Therefore, the Joint Venture maintains, the Corporations had no right to share in the Joint Venture's Exxon claims. The Joint Venture argues that even though the only date listed as an eligibility requirement for the Exxon claim is the day of the Exxon spill, March 24, 1989, the claim did not actually accrue until the oil hit the Joint Venture land sometime after March 31, 1989.

We agree with the Corporations: It is immaterial whether the Exxon claim accrued before or after the Corporations' withdrawal. If the claim accrued before withdrawal, it was a Joint Venture asset subject to distribution to the Corporations just like any other asset by virtue of § 1.05 of the Joint Venture agreement:

> *All revenues (including proceeds resulting from the disposition or destruction of Joint Venture property) realized and all costs, charges and expenses incurred in conducting Joint Venture business will be distributed or shared by the joint venturers in the manner provided in Section 1427(c) of Public Law 96–487 [by which the venturers' individual interests were calculated].* ... Funds not required for working capital purposes may be distributed to the joint venturers at such times as designated by the Board. Management of the Joint Venture will establish a system to effect the foregoing, which system will have as an objective the minimization of working capital operating funds committed by each joint venturer.

(Emphasis added.)

If the claim accrued after withdrawal, it is covered by our decision in *Old Harbor I*. There, we held that after the Corporations withdrew in April 1989, the Joint Venture "stood in the position of a trustee because the Corporations were no longer members of the Joint Venture but were joint owners of the assets."[25] In other words, the Joint Venture and the Corporations held the land and assets as tenants in common between April 1989 when the Corporations withdrew and July 1991 when the land and assets were partitioned.[26] Accordingly, if the claim accrued after withdrawal, it would belong to the Corporations as tenants in common whose title was held in trust by the Joint Venture.

For these reasons, we conclude that the superior court did not err when it deter-

---

**25.** *Old Harbor I,* 30 P.3d at 106. However, the court explicitly declined to determine the nature of the interest before withdrawal. *Id.* at 109 n. 31.

**26.** *See* AS 34.15.130:

> Except as provided in AS 34.15.110(b) [presumption of tenancy in entirety where husband and wife hold title] and AS 34.77.100 [community property trust], *persons having an undivided interest in real property are considered tenants in common.*
> (Emphasis added.)

mined that the Corporations owned a portion of the Exxon claim.

## B. The Superior Court Did Not Err in Ruling that the Parties Made a Mutual Mistake of Fact.

■ The Joint Venture initially argues that its only mistake was in failing to predict at the time of partition that in a few years it would have a large Exxon claim. It argues that the parties did not intend to allocate assets of minimal value, which would have included the Exxon claim at the time of partition, since the Alyeska and Exxon settlements were still years away when the Corporations signed the partition agreement and no one could have predicted that actual damage to the land would not be required for an Exxon claim. The Corporations respond that, given the parties' knowledge of a potential claim during partition, their real mistake was in failing to fulfill their commitment to "consider all the AJV's rights and divide such accordingly."

We agree with the Corporations. No party claimed to be unaware during partition negotiations of other Exxon claims or that the Joint Venture lands had been oiled. The Joint Venture's subjective valuation of the Exxon claim as small or even zero is irrelevant[27] for, as we held in *Old Harbor I,* the settlement agreement "purported to 'resolve all of the [Joint Venture] and [the Corporations'] rights arising from [the Corporations'] withdrawal from the [Joint Venture].' "[28] We conclude that the superior court did not err in ruling that the parties made a mutual mistake of fact.

## C. The Superior Court Did Not Err in Dividing the Exxon Claim Between the Parties.

■ In *Old Harbor I* we held that the mutual mistake of fact alleged by the Corporations, if proven, would merit "reformation

of the settlement agreement and release," since it satisfied the three-part test for mutual mistake of fact: (1) the parties' failure to discuss the Exxon claims undermined the "basic assumption" that the release would address all of the Joint Venture's assets; (2) the Exxon claims, worth millions of dollars, were material to the transaction; and (3) nothing in the settlement agreement transferred the risk of a mutual mistake to the Corporations.[29]

According to the Joint Venture, reformation of the partition agreement was inappropriate since the parties did not reach an agreement on the Exxon claim and they did not have identical views on the claim's value during their partition negotiations. The Joint Venture notes that "[w]hile the corporations may have believed AJV land to have been damaged, the AJV did not." However, the parties did have a common intent to account for all of their assets. The Joint Venture's argument that one of the assets was insignificant does not change the goal of the parties' agreement, especially in light of the Joint Venture's fiduciary duty to disclose "the status of Joint Venture assets—including the Exxon claim—during the period following the Corporation's withdrawal but prior to the completion of the partition process."[30]

Nevertheless, upon reexamination of our holding in *Old Harbor I,* we note that when using the term "reformation" we may have misdirected the superior court on terminology, although not on the law. According to the RESTATEMENT (SECOND) OF CONTRACTS § 155, reformation is available to correct a mutual mistake of fact when a contract fails to express the actual agreement between the parties.[31] That is, reformation would be strictly appropriate where the parties had actually agreed to apportion the Exxon claim

---

**27.** The claim is also suspect, considering the fact that within a year of the partition, the people who managed both Afognak Native Corporation and the Joint Venture modified Afognak Native Corporation's claim against Exxon to include damages for oiling of the latter's land.

**28.** 30 P.3d at 108.

**29.** *Id.*

**30.** *Id.* at 107.

**31.** RESTATEMENT (SECOND) OF CONTRACTS § 155 (1979).

and had merely failed to record it.[32] In the present case, by contrast, the superior court correctly concluded that the parties' mistake consisted of their failure to discuss the Exxon claim at all. Here the court's power to reshape the contract is expressed more clearly by § 158 of the Restatement. According to that section, in a case of mistake where neither damages, avoidance of the contract, reformation, restitution, or other remedies provided in Chapter 6 of the Restatement are available, the court may exercise its equitable power "to grant relief on such terms as justice requires."[33] Relief under these circumstances may include supplying a term to the parties' agreement.[34] We have previously expressed our willingness to imply a contract term in order to conform a contract to the evident intent of the parties.[35] In this case, the parties clearly intended, and the Joint Venture was required (on account of its fiduciary duty towards the Corporations and by Article VI, § 6.01 of Exhibit C to the Joint Venture agreement), to account for and apportion all of the Joint Venture's assets. By awarding 18.37% of the Joint Venture's Exxon claim to the Corporations the superior court gave effect to the reasonable expectations of the parties.

While we conclude that the superior court did not err in dividing the Exxon claim between the parties, as we noted above the court had the power to "grant relief on such terms as justice requires."[36] Because our earlier remand may have incorrectly focused the court's and the parties' attention on reformation under § 155, it is unclear whether the superior court was aware of this power and whether the parties had a full opportunity to litigate all issues under it. Accordingly, we remand for the limited purpose of allowing the superior court to consider whether the Joint Venture is entitled to a set-off for any costs it incurred in obtaining compensation under the Exxon claims.[37]

### D. The Joint Venture's Remaining Arguments on Appeal Are Without Merit.

■ The Joint Venture argues that the Corporations acted in bad faith by not informing the Joint Venture of the Corporations' opinion that the Exxon claim had value. According to the Joint Venture, the Corporations' knowledge of the claims was superior to the Joint Venture's because Old Harbor, representing a class of landowners that included the Joint Venture, filed suit against Exxon during or just before the period of partition negotiations. But the superior court found that all of the parties were aware of potential claims. The evidence supports this finding. The Joint Venture also alleges numerous factual mistakes in the superior court's findings. However, the Joint Venture does not assert that any of these alleged mistakes is material to the outcome of the

32. *Id.* at cmt. b. *See also* RESTATEMENT (SECOND) OF CONTRACTS, ch. 6, introductory note at 379 ("Where, however, because of a mistake of both parties as to expression the writing fails to express an agreement that they have reached previously, the appropriate relief ordinarily takes the form of reformation of the writing to make it conform to their intention.").

33. RESTATEMENT (SECOND) OF CONTRACTS § 158(2). *See also* RESTATEMENT (SECOND) OF CONTRACTS, ch. 6, introductory note at 381 ("The rules governing [mistake] have traditionally been marked by flexibility and have conferred considerable discretion on the court.").

34. RESTATEMENT (SECOND) OF CONTRACTS § 158 cmt. c.

35. *See, e.g., Ellingstad v. State, Dep't of Natural Res.,* 979 P.2d 1000, 1008 (Alaska 1999) (holding that where contract silent court may supply rea-

sonable term to fulfill parties' expectations). *See also Rego v. Decker,* 482 P.2d 834, 837 n. 8 (Alaska 1971) (stating that apparent difficulties of enforcement due to uncertainty of expression often disappear in light of "courageous common sense").

36. RESTATEMENT (SECOND) OF CONTRACTS § 158(2).

37. *See Edwards v. Alaska Pulp Corp.,* 920 P.2d 751, 754 (Alaska 1996) (noting that under common fund doctrine "a litigant ... who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"). *Accord Quinn v. State of California,* 15 Cal.3d 162, 124 Cal.Rptr. 1, 539 P.2d 761, 764 (1975) ("[O]ne who expends attorneys' fees in winning a suit which creates a fund from which others derive benefits, may require those passive beneficiaries to bear a fair share of the litigation costs.").

case. In these circumstances, there is no basis for reversal.[38]

## V. CONCLUSION

The superior court correctly determined ownership of the Exxon claim and the nature of the parties' mistake in partitioning their assets. Therefore, we AFFIRM the superior court's judgment that the Exxon claims should be divided between the parties. We REMAND so that the superior court may fix the Corporation's proportionate share of the Exxon claims. At that time the court may consider whether the Joint Venture is entitled to offset any costs it bore in pursuing the Exxon claims.

---

**38.** *Fairbanks North Star Borough v. Rogers & Babler,* 747 P.2d 528, 531 (Alaska 1987) ("[E]ven if a finding of fact or conclusion of law is errone-ous, the mistake is not grounds for reversal if the finding or conclusion is not necessary to the court's ultimate decision.").