Blaine B. CHASE, C. Alan Hackstaff and Robert Hackstaff, Plaintiffs–Appellants,

v.

The DOW CHEMICAL COMPANY, a Delaware corporation, Defendant–Appellee.

No. 87–2060.

United States Court of Appeals, Tenth Circuit.

May 19, 1989.

William E. Dorigan of Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., for plaintiffs-appellants.

Bruce D. Drucker of Rivkin, Radler, Dunne & Bayh, Chicago, Ill. (Warren S. Radler, Dale R. Crider, Dorothy B. Zimbrakos, and Victoria A. Walkowicz of Rivkin, Radler, Dunne & Bayh, Chicago, Ill., Walter A. Steele and Michael L. O'Donnell of White and Steele, Denver, Colo., and J. Roger Lochhead of The Dow Chemical Co. Legal Dept., Litigation Section, Midland, Mich., of counsel), for defendant-appellee.

Before LOGAN, SETH and TACHA, Circuit Judges.

SETH, Circuit Judge.

Plaintiffs brought this diversity action to recover damages allegedly caused by defendant Dow Chemical Company's product, Sarabond, to the exterior masonry walls of plaintiffs' three-story office building. Dow moved for summary judgment, citing a 1981 Release and Indemnification Agreement executed between it and plaintiffs, wherein Dow paid plaintiffs $30,000 to resolve a dispute over cracking in the brick piers supporting the canopy over the front door of plaintiffs' building. By the terms of this release, plaintiffs agreed to give up "any and all claims, demands, and causes of action [they] have now or might have now, ever had, or may have in the future, known or unknown," arising from or connected with the use of Sarabond in the building.

The parties agree on appeal that the release, if binding, bars all the claims plaintiffs raise in this suit. Plaintiffs alleged in their Second Amended Complaint, however, that the release should be declared void since Dow fraudulently induced plaintiffs to execute it. In granting summary judgment to Dow, the trial court held that, as a matter of law, plaintiffs could not satisfy three of the five elements necessary to establish a claim for fraud under Colorado law. *In re Dow Company "Sarabond" Products Liability Litigation*, 660 F.Supp. 270, 274 (D.Colo.). The trial court also held that the doctrine of mutual mistake could not be applied to void the terms of the release. *Id.* at 275. Plaintiffs appeal from this judgment. Because we find the trial court did not properly apply the law to the evidence contained in the record on the issue of whether the release was procured through fraud, we reverse as to that issue.

Summary judgment is appropriate only when the documentary evidence before the court demonstrates that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit" when applying the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202. In reviewing the trial court's entry of summary judgment for Dow, "[t]he evidence of the [plaintiffs] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255, 106 S.Ct. at 2513. The evidence presented by plaintiffs in response to Dow's motion for summary judgment is summarized below.

Sarabond was developed by Dow in the 1950's to increase the bond strength of brick to mortar, thus making for stronger brick walls. The main solid component of Sarabond is saran latex, which contains vinylidene chloride. Vinylidene chloride releases chlorine when mixed with mortar, which in turn leads to the corrosion of steel embedded in the mortar. Over a period of years the corrosion product buildup occupies a far greater volume than the original steel. The stress exerted by this buildup

eventually leads to cracking in the mortar and the bricks.

Research conducted by Dow resulted in findings that Sarabond does cause corrosion and cracking. The November 2, 1972 Frenier Report contains information about the corrosive tendencies of Sarabond that would be crucial to any engineer investigating the masonry distress of a building containing Sarabond. As relevant to this lawsuit, the Frenier Report concludes:

1. The amount of chloride released by Sarabond after one year is 67 times the amount found in the normal mortar, and over twice the amount identified by Dow as the threshold amount necessary to start corrosion. Further, the chloride release from Sarabond continues as the mortar ages.

2. Where a steel rod is fully encased in Sarabond, corrosion is considerably worse than is the case for a rod fully encased in normal mortar.

3. Where a steel rod is partially encased in Sarabond and partially kept in a water-filled void, the interaction of the Sarabond and the water causes corrosion to occur in the void 100 times faster than the rate of corrosion for the embedded portion, while in a normal mortar sample the corrosion rate is only 14.5 times greater in the water-filled void.

Affidavit of Dr. Robert Kudder at 5. *See also* Affidavit of David Austin at 5. This data is highly technical information that a prudent structural engineer would not know or have reason to expect. Plaintiffs and their experts did not obtain access to the information contained in the 1972 Frenier Report until May 1985.

Architect Michael Lombardi used Sarabond in the exterior walls of plaintiffs' building when it was constructed in 1970. In 1975, certain hairline cracks appeared in the brick piers supporting the canopy over the front door of the building. Over the course of the next year and a half, Dow conducted a rather lengthy correspondence with Lombardi and with Mr. Dell Hogy, a representative of plaintiffs, over Sarabond's role in causing the cracking. Dow feigned ignorance as to the cause of the cracking and repeatedly requested specific evidence linking the cracking to Sarabond. In a letter dated June 22, 1976, Dow made the following representations to Mr. Hogy:

"SARABOND is sold on the assurance that it produces a high strength mortar —considerably stronger ... than any mortar with which I am familiar. There is also an implied warranty that this strength will not deteriorate with time, and *there is a considerable body of data that supports this fact.* If there is data [to the contrary], we are, of course, most anxious to have you share this information with us."

(Emphasis added.) This letter was written by Mr. Dallas Grenley, one of the authors of Dow's 1972 Frenier Report. Lombardi asked Dow numerous times during this period if there was any available in-house data concerning potential Sarabond deterioration or corrosion but was never provided with the Frenier Report or any other internal data from Dow.

Dow inspected plaintiffs' building in October 1976, in June 1978, and in September 1979. At the request of Dow's expert, plaintiffs shipped masonry samples to a lab in Texas. In December 1979, plaintiffs' lawyer asked Dow for feedback from the inspections. Dow responded by letter, stating that the samples were "currently being evaluated" but that "additional samples and pictures" were needed. Dow acknowledged it had examined a number of buildings containing Sarabond that were experiencing similar cracking problems. "What we are finding is a consistent pattern of design defects in the structures or faulty workmanship or both. Neither cause has anything to do with Sarabond." The letter described Dow's effort as "cooperative" and noted that Dow "[does] not regard [itself] as in an adversary position to [the plaintiffs]."

In 1979, plaintiffs retained David Austin, an independent consultant, to evaluate their building's problems. While Austin had heard that Sarabond released chlorides into mortar, he believed that oxygen and moisture leaking through the outside walls might be combining with the chlorides to

cause corrosion and cracking. Austin and Lombardi both recommended that the cracks be caulked and the walls sealed—all to prevent further entry of water and air. They believed this repair would sufficiently limit access of outside oxygen and water to the steel so as to retard further corrosion. This recommendation was communicated to Dow.

Plaintiffs held two meetings with Dow, in July 1980 and January 1981, following Dow's investigation of the cracking. Dow claimed the building had been designed and constructed so as to allow excess air and water to enter and be retained inside the masonry. Dow claimed the cracking occurred after the excess water froze. Dow specifically denied that Sarabond played any role in the cracking or in the corrosion of the steel. Instead, it stated that its in-house data demonstrated Sarabond did not deteriorate and was not corrosive. Finally, Dow agreed that blocking the entry of air and water from the outside should resolve the problem. At no time did Dow mention the data concerning Sarabond's corrosive behavior contained in the 1972 Frenier Report. *See* Affidavits of David Austin, C. Allan Hackstaff, and Blaine Chase.

Based upon Dow's representations and the advice of their own expert, plaintiffs believed that caulking and sealing the building would solve the cracking and corrosion problem. Accordingly, plaintiffs accepted $30,000 from Dow in 1981 pursuant to the Release and Indemnification Agreement. This money was for replacement of the cracked masonry piers of the canopy and for caulking and sealing the rest of the building.

In May 1985, plaintiffs were contacted by Lombardi and told of the existence and content of the 1972 Frenier Report. Lombardi obtained access to the report while serving as an expert in another Sarabond-related lawsuit in Minnesota. After reviewing the report, Lombardi informed plaintiffs that Sarabond could cause enough distress in their building to create "a danger to person or property." As a result of Lombardi's warning, plaintiffs en-gaged a structural engineer with previous Sarabond experience, Dr. Robert Kudder, to inspect the building. Kudder determined that the entire masonry facade of the building was irreparably distressed due to Sarabond and would have to be replaced at an estimated cost of over $1 million. Kudder concluded that the distress was unrelated to the entry of excess air and water and that the caulking and sealing performed by plaintiffs was totally ineffectual. In Kudder's opinion, Sarabond has been the sole cause of the building's distress. According to Kudder, a reasonably prudent engineer would not have reached this conclusion without access to the data contained in the Frenier Report.

The five elements of fraud under Colorado law are set out in *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458: (1) a false representation of a material fact or a concealment of a material existing fact; (2) knowledge on the part of the one making the representation that it is false or knowledge that he is concealing a material fact that in equity or good conscience ought to be disclosed; (3) ignorance on the part of the one to whom the representation is made or from whom such fact is concealed of the falsity of the representation or of the existence of the fact concealed; (4) the representation or concealment is intended to be acted upon; (5) action is taken on the representation or concealment that causes damages.

The theory of fraud advanced by plaintiffs at trial can be stated rather simply. They allege that Dow made numerous false and misleading representations that induced them to enter into the Release and Indemnification Agreement. Further, they allege that Dow knew these representations were false or misleading and intended that plaintiffs would rely on them in deciding to enter into the release. "A release is an agreement to which the general contract rules of interpretation and construction apply." *Rocky Mountain Ass'n of Credit Management v. Hessler Manufacturing Co.*, 37 Colo.App. 551, 553 P.2d 840, 842. Like any contract, a release procured through fraud can be set aside. *Dodds v.*

*Frontier Chevrolet Sales & Service, Inc.,* 676 P.2d 1237, 1238 (Colo.App.).

The trial court granted Dow's motion for summary judgment after finding that, as a matter of law, plaintiffs would be unable to satisfy the first, third, and fifth of the five elements of fraud. We consider each element in turn.

■ The trial court held that plaintiffs could not satisfy the first element of their cause of action for fraud in the inducement because Dow had no duty to disclose the information contained in the 1972 Frenier Report, or any other information regarding Sarabond, to the plaintiffs prior to executing the release. 660 F.Supp. at 273. This focus on the existence of a duty to disclose resulted from the trial court's overly strict interpretation of plaintiffs' claim as one for fraudulent concealment. Where, as here, plaintiffs alleged and offered evidence of affirmative misrepresentations and misleading half-truths on the part of Dow, the existence of a duty to disclose is no longer determinative.

We hold that plaintiffs have established a genuine issue of material fact as to the first element of their claim of fraud in the inducement. Plaintiffs have presented evidence that, from 1976 to 1981, Dow continually feigned ignorance as to the cause of the cracking in plaintiffs' building and repeatedly requested specific evidence linking the cracking to Sarabond. In Dow's June 22, 1976 letter to plaintiffs, Mr. Dallas Grenley (one of the co-authors of Dow's 1972 Frenier Report) first represented that "a considerable body of data" existed supporting the proposition that Sarabond does not cause masonry to deteriorate. Dow presented no evidence to the trial court in support of this representation. Mr. Grenley next represented that Dow was unaware of any data contradicting the proposition that Sarabond does not cause masonry to deteriorate. This statement was made by Grenley with full knowledge of the contents of the Frenier Report.

Plaintiffs also presented evidence of two meetings held between Dow and plaintiffs in July 1980 and January 1981. At those meetings, Dow claimed the building had been designed and constructed so as to allow excess air and water to enter and be retained inside the masonry. Dow claimed the cracking occurred after the excess water froze. Dow specifically denied that Sarabond played any role in the cracking or in the corrosion of the steel. Instead, it stated that its in-house data showed Sarabond did not deteriorate and was not corrosive. Finally, Dow agreed that blocking the entry of air and water from the outside would resolve the problem. At no time during these meetings did Dow mention the data contained in the 1972 Frenier Report concerning Sarabond's corrosive behavior.

Plaintiffs also presented evidence, including expert testimony, demonstrating that the representations discussed above were either false or misleading. Plaintiffs have pleaded and offered sufficient evidence of Dow's misrepresentation of material facts to satisfy the first element of their claim of fraud in the inducement.

The trial court next held that plaintiffs could not satisfy the third element of their claim of fraud in the inducement since they had full knowledge of the facts that Dow is alleged to have misrepresented. 660 F.Supp. at 274. The trial court held that the evidence before it "amply demonstrate[s] plaintiffs' awareness and active pursuit of a claim that the damage to [their] building was caused by Sarabond's alleged defective qualities." *Id.*

The trial court's opinion oversimplifies and thus misconstrues the nature of plaintiffs' claim in this case. Plaintiffs have never disputed that they suspected Sarabond was *partly* to blame for the cracking and corrosion occurring in their building. Plaintiffs blamed Sarabond for the damage to their building because they suspected Sarabond's chlorides were combining with air and water from outside the building to cause the corrosion of steel embedded in the mortar. Dow represented to plaintiffs that their theory was *correct.* Dow agreed that the elimination of excess air and water by caulking the building would remedy the corrosion and cracking, while in reality Dow's internal testing demonstrated that the elimination of all outside air and water

would not prevent further corrosion and cracking.

Thus, Dow's alleged misrepresentation occurred when Dow confirmed plaintiffs' theory about how the damage to their building was being caused. Plaintiffs claim that Dow misrepresented the extent of its knowledge as to the cause of the distress, the nature of the corrosion process, and the appropriate means for preventing future damage. Plaintiffs now know their theory was incorrect and they allege that, even though Dow knew it was incorrect, Dow induced plaintiffs to enter into the release by fraudulently convincing them that their theory was indeed correct and that further corrosion and cracking could be prevented by merely caulking the building. Plaintiffs' experts state that only through access to Dow's 1972 Frenier Report would plaintiffs have been able to know that outside air and water entry played no significant role in causing the distress in their building. Only from this data could they have known of the inadequacy of Dow's remedial proposal.

Nothing contained in the documentary evidence offered by Dow defeats plaintiffs' theory on this issue under the standard of review prevalent on a motion for summary judgment. In particular, we have reviewed the 1981 complaint filed by plaintiffs against Dow in connection with problems plaintiffs were experiencing at a second office building and we find nothing in that complaint which refutes plaintiffs' claim that they were fraudulently induced to enter into the release at issue in this case.

Because plaintiffs offered evidence that they did not become aware of the data contained in the Frenier Report until 1985, four years after they entered into the release, they have made the requisite showing that they were ignorant of the *particular* facts they now accuse Dow of misrepresenting. Plaintiffs have pleaded and offered sufficient evidence to satisfy the third element of their claim of fraud in the inducement.

Finally, the trial court held that plaintiffs could not satisfy the fifth element of their claim of fraud in the inducement since they were unjustified in relying on the veracity of Dow's representations. 660 F.Supp. at 274. The trial court noted that the relationship between Dow and plaintiffs was a "fully adversarial" one. *Id.* at 273. Further, plaintiffs "knew or should have known of the existence of their fraud claim at the time the release was executed.... Under these circumstances, plaintiffs had no right to rely on any misrepresentations, or to act on any concealments, concerning Sarabond's possible causal role in their building's damage." *Id.* at 274. The trial court relied on *Pettinelli v. Danzig,* 722 F.2d 706 (11th Cir.), for the proposition that when negotiating the settlement of an existing controversy involving fraud, it is unreasonable to rely on representations made by the allegedly dishonest parties. *Id.* at 710.

■ It is important at this point to distinguish between plaintiffs' claim that Dow fraudulently induced them to enter into the release and plaintiffs' claim that Dow was guilty of fraud when it marketed Sarabond in the early 1970's. The essence of the trial court's holding is that the existence of the latter claim, coupled with plaintiffs' awareness of that claim in 1981, bars the assertion of the former claim in this suit.

Under the trial court's reasoning, one is never justified in believing anything represented by an adversary to a dispute that involves a claim of fraud. We cannot agree with such a doctrine. The public routinely negotiates the settlement of disputes in reliance upon the representations of the other party. While every dispute is "adversarial" to some degree, the parties must have some assurance of legal recourse if they are induced to settle the dispute on the basis of false representations of material facts. To hold otherwise would discourage parties from settling their disputes out of court. This is true regardless of whether or not the underlying dispute involves an allegation of fraud. Thus, we hold that a party is not categorically barred from relying on the representations of the opposing party when negotiating the settlement of a dispute which involves a claim for fraud.

This case presents a far different factual background from the one in *Pettinelli.* Unlike *Pettinelli,* the underlying dispute between plaintiffs and Dow primarily involved a claim for property damage, not fraud. Plaintiffs' claim that Dow was guilty of fraud when it marketed Sarabond in the early 1970's was only one of many Sarabond-related claims intended for settlement when plaintiffs and Dow entered into the 1981 Release and Indemnification Agreement. *See* plaintiffs' 1981 complaint against Dow, filed in connection with problems plaintiffs were experiencing at a second office building. (Dow asserts that the claims contained in that complaint are identical to the claims plaintiffs intended to assert in this case prior to executing the Release and Indemnification Agreement.)

We also disagree with the trial court's characterization of the relationship between plaintiffs and Dow as "fully adversarial." To the contrary, plaintiffs and Dow had been working together for several years in a supposedly mutual effort to remedy the problems with plaintiffs' building. Dow inspected the building on numerous occasions and even went so far as to have its masonry expert inspect and analyze masonry samples from the building. In a December 20, 1979 letter to plaintiffs, Dow described its relationship with plaintiffs as "cooperative" and noted that Dow did not regard itself as in "an adversary position" to plaintiffs. Dow repeatedly advised plaintiffs on the nature of their problem and offered opinions on how to remedy the problem. Plaintiffs believed Dow was sincere in its efforts to help, and Dow's advice seemed reasonable given the state of plaintiffs' technical knowledge during this period.

Plaintiffs have pleaded and offered sufficient evidence to satisfy the fifth element of their claim of fraud in the inducement. A jury could find that plaintiffs reasonably relied on Dow's allegedly false representations.

Plaintiffs alleged sufficient facts through their pleadings, documents and affidavits to establish genuine issues of material fact relating to their claim that Dow fraudulently induced them to enter into the 1981 Release and Indemnification Agreement. The trial court erred in granting Dow summary judgment on this claim.

Plaintiffs also appeal the trial court's entry of summary judgment for Dow on their claim that the release was the product of a mutual mistake. We affirm that portion of the trial court's opinion which holds that plaintiffs bore the risk of a mistake under the terms of the release agreement. 660 F.2d at 275. Absent fraud on the part of Dow inducing plaintiffs to enter into the release, plaintiffs are bound by the terms of the release and are barred from bringing this suit.

Finally, Dow argues on appeal that plaintiffs' claims are time barred by the applicable Colorado statutes of limitation. The trial court declined to rule on this issue.

This court is "generally reluctant to affirm a trial court's decision on legal grounds not considered by the trial court." *Wilson v. St. Louis–San Francisco Ry. Co.,* 673 F.2d 1152, 1155 (10th Cir.). Numerous factual issues relating to the application of Colorado's statutes of limitation to this case were not addressed by the trial court and we decline to address them on appeal.

The judgment of the trial court is AFFIRMED in part and REVERSED in part and the case is REMANDED for further proceedings.