INDUSTRIAL COMMERCIAL ELEC-
TRIC, INC., an Alaska Corporation, and
Michael W. Hannaman, Appellants,

v.

Rick L. McLEES, individually, Rick L.
McLees d/b/a Ricky McLees Electric,
Janet McLees, McLees Electric, LLC,
and Michael Landowski, Appellees.

No. S–10447.

Supreme Court of Alaska.

Nov. 12, 2004.

Verne E. Rupright, Rupright & Foster, LLC, Wasilla, for Appellants.

Erling T. Johansen, Davison & Davison, Inc., Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

1. Our summary of the facts is derived from the materials submitted in the summary judgment proceedings below. When reviewing a grant of summary judgment, we draw all reasonable inferences of fact in favor of the non-moving party.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

After Industrial Commercial Electric, Inc. (ICE) and Michael Hannaman filed suit against a former employee and others, the superior court dismissed their suit on summary judgment, holding it was barred by releases they signed before filing suit. But the validity of the releases raises genuine issues of material fact, because there are unresolved factual disputes about whether the employee fraudulently misrepresented facts and whether ICE and Hannaman were induced to sign the releases in justifiable reliance on those alleged misrepresentations. We therefore reverse and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

Michael Hannaman is president and majority shareholder of ICE. In mid–1998 he had a dispute with an ICE employee, Rick McLees, about McLees's relationship with ICE.[1]

The employment relationship had begun to erode in the summer of 1998 when Hannaman suspected that McLees and his wife, Janet McLees, had taken some of ICE's corporate files without Hannaman's permission. The McLeeses possessed most of ICE's accounts receivable files, original contract files, and bank statements. Hannaman contacted Janet McLees and asked the McLeeses to return the documents. Although Janet McLees admitted that she and her husband had ICE's files at their home, she did not comply with Hannaman's request. In an attempt to regain control of his company, Hannaman removed Rick McLees from the corporate checking account and changed the lock on the corporate mailbox.

Rick McLees resigned from his positions as an "employee, electrical administrator, and corporate officer" of ICE in October 1998.[2] Hannaman and Rick and Janet

*See Meidinger v. Koniag, Inc.,* 31 P.3d 77, 82 (Alaska 2001).

2. There may be a factual dispute whether McLees was a corporate officer when he re-

McLees then entered into an oral agreement, which ended Rick McLees's employment with ICE. Per the oral agreement, the McLeeses promised to return all of ICE's bank records and contract and accounts receivable files. In exchange, Hannaman also agreed to compensate Rick McLees upon completion of two outstanding projects, which the parties referred to as the "Tesoro projects." The parties agreed that upon completion of the Tesoro projects, the McLeeses were "to return all property purchased or taken to Fairbanks for the Tesoro projects and contact [Hannaman] through their attorneys immediately upon returning to Anchorage ... at which time [they] would together divide the contents of the [company] van." The parties also agreed that "the McLees were to return everything else belonging to [Hannaman] or ICE, Inc. in their possession and/or control."

In an affidavit he later executed, Hannaman stated that "based on Rick and Janet McLees' representations and promises ... [he] agreed to settle with the McLees." The parties agreed to memorialize their oral agreement in a formal settlement agreement and mutual release.

Per the oral agreement, Hannaman went to the McLeeses' home on October 19, 1998 to inspect the van used to transport equipment for the Tesoro projects and to collect any tools belonging to ICE. Although Hannaman recovered some of his tools from the McLeeses' home, Rick McLees refused to let Hannaman inspect the company's utility trailer or the McLeeses' padlocked storage shed. When Hannaman returned to pick up additional materials, Rick McLees gave Hannaman additional tools, "representing [that these were] the only materials left over from the Tesoro projects."

On November 10 Hannaman, ICE, Rick and Janet McLees, and their attorneys met for the purpose of entering into a twenty-nine page written final settlement agreement and mutual releases memorializing their prior oral agreement. The agreement recited as consideration "fulfillment" of various undertakings the signatories were to accomplish. These provisions required Rick McLees to do certain things, including some in the future (such as completing work on specific ICE contracts with third persons). The provisions also required Rick McLees to do certain things by November 10, including returning "all corporate records, mail, job files, [and] project records" for specified projects; furnishing information to allow ICE to bill for change orders or extra work on those projects; and "returning ... all other corporate property." The written agreement contained broadly worded mutual releases. The agreement also stated that Rick McLees, Hannaman, and ICE released each other from any potential claims which were "known, or which may be subsequently discovered and which are not yet known to the parties at this time."

Paragraph 29 of the written agreement provided that Hannaman, individually and as president of ICE,

> acknowledges that Rick L. McLees has tendered all performances due under this settlement agreement and mutual release; and that Michael Hannaman and Industrial Commercial Electric, Inc. have actually received full, complete, and satisfactory performance.... [T]o the extent that Rick L. McLees has not tendered full and satisfactory performance of all such obligations, Michael Hannaman and Industrial Commercial Electric, Inc. hereby waive and release Rick L. McLees from any further obligation.

The agreement stated that it represented the parties' "entire agreement" and superseded "any and all prior and contemporaneous agreements, promises, representations, warranties, contracts and covenants, oral or written, relating to such subject matter." A second mutual release released Janet McLees, Hannaman, and ICE from any present or future claims any party may have had against the others. ICE also executed a bill of sale to Rick McLees for the company van,

signed from ICE in October 1998. His letter of resignation stated that he was resigning as a corporate officer "if [he was] in fact a corporate officer." The record indicates that McLees was vice president and secretary in 1997. No evidence brought to our attention establishes that he held a corporate office in 1998.

a laptop computer, a utility trailer, and miscellaneous tools.

Before Hannaman signed the releases for himself and ICE at the November 10 meeting, Hannaman's attorney, Grant Watts, asked the McLeeses whether they had any corporate property to return to ICE and whether they had any corporate property remaining at their home or in their garage or shed. According to Hannaman's February 6, 2001 affidavit, the McLeeses said they did not have anything else to return except "a wire cart and a rug." Hannaman's affidavit stated that Watts then asked the McLeeses whether they had any other files belonging to ICE in their possession. According to Hannaman's affidavit, the McLeeses responded that the two boxes they brought with them to the meeting were the only files they still possessed. Hannaman's affidavit stated that the McLeeses' attorney, Paul Crowley, also asked his clients if they had anything else to return. According to Hannaman's affidavit, the McLeeses responded that they could not think of anything else. In an affidavit he executed January 9, 2001, Watts attested that, "I advised Mr. Crowley (in the presence of Rick McLees and Janet McLees) that ICE and Mr. Hannaman were relying upon the representations on the part of Rick and Janet McLees in regards to signing the [settlement agreement and mutual releases]."

The parties executed the settlement documents, apparently after these conversations took place. Hannaman later attested in his affidavit that as of the close of business on November 10, the McLeeses had not returned all of Hannaman and ICE's property that they had in their possession, including contract and change order files for the "Sisters Island" project. Rick McLees had only submitted one bill for the Sisters Island project to Hannaman and ICE. Hannaman's affidavit also stated that the McLeeses also had not returned itemized invoices for tools that Rick McLees had purchased on ICE's account and did not disclose or return seven other items of equipment.

ICE and Hannaman, in his individual capacity, filed a complaint in superior court in October 2000 against (1) Rick McLees alleging breach of fiduciary duty, breach of contract, and interference with contractual relationship; (2) Rick McLees and Janet McLees alleging misrepresentation, fraud, coercion, interference with prospective economic relationship, and emotional distress; (3) Michael Landowski, an apprentice electrician, alleging breach of the duty of good faith and fair dealing and emotional distress; and (4) Crowley & Hiemer, the law firm that represented the McLeeses, and lawyers Paul Crowley and Linda J. Hiemer individually, alleging economic coercion and emotional distress.

The McLees defendants (Rick McLees, Rick McLees d/b/a Ricky McLees Electric, Janet McLees, McLees Electric, LLC, and Michael Landowski) filed counterclaims against Hannaman and ICE for, among other things, breach of contract, quantum meruit, interference with contractual relations, tortious business destruction, business or professional defamation, punitive damages, and abuse of process.

The McLees defendants moved for summary judgment, arguing that all of plaintiffs' claims were barred by the settlement agreement and mutual releases. The Crowley defendants (Paul Crowley, Linda Hiemer, and Crowley & Hiemer, LLC) moved for summary judgment on Hannaman and ICE's economic coercion claim. In opposing these motions, Hannaman submitted the previously discussed affidavits he and Grant Watts executed in 2001, and the affidavit of Dean Pratt, a former ICE employee.

The superior court granted summary judgment to all defendants, and dismissed all of ICE and Hannaman's claims. The court held that none of the defendants acted coercively or fraudulently. The court also held that if the McLeeses had misrepresented facts, their misrepresentations were not material to Hannaman and ICE's decision to enter into the settlement agreement and mutual releases. Finally, the court concluded that the settlement agreement released all defendants from the claims brought by ICE and Hannaman. The court observed that "[t]hese agreements are very extensive and this court finds that the parties intended them to bar any further litigation over the parties' business relationship."

Hannaman and ICE appeal the summary judgment.[3]

## III. DISCUSSION

### A. Standard of Review

■ We review grants of summary judgment *de novo* and will uphold a grant of summary judgment when the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[4] A party opposing summary judgment need not prove that it will prevail at trial, but only that there is a triable issue of fact.[5] We draw all reasonable inferences of fact in favor of the non-moving party, applying our independent judgment to any questions of law and adopting the rule of law most persuasive in light of precedent, reason, and policy.[6]

### B. The Settlement Agreement and Mutual Releases Will Not Bar Hannaman and ICE's Claims if the Agreement and Releases Are Invalid.

■ Hannaman argues that the settlement agreement and mutual releases do not bar his claims against the McLeeses.[7] He argues that the releases, like other contracts, may be avoided if he entered into them as a result of fraud, misrepresentation, or duress attributable to the McLeeses. Hannaman contends that because he is challenging the

validity of the releases, the language and scope of the releases is irrelevant.

The McLeeses argue that all of Hannaman's claims are released by the settlement agreement and mutual releases. The McLeeses contend that it was the intent of the parties when they signed the agreement and releases "to dispose of all those claims whether known or unknown" and that the parties had "washed their hands of their relationship."[8]

■ We have explained that "a valid release of all claims arising under a contract will bar any subsequent claims based on that contract."[9] We have given effect to mutual releases, even when parties did not specifically list all possible claims.[10] The McLeeses rely on *Martech Construction Co. v. Ogden Environmental Services, Inc.*, in which we held that the broad language of a release precluded a subcontractor's claim against a contractor for post-settlement conduct.[11] We stated, "[t]he broad language used [in the release] implies that claims not specifically contemplated are settled."[12]

■ *Martech*, however, dealt with the scope of the release and not the validity of the contract containing the release. We have held that settlement agreements and releases, like any other contracts, are susceptible to attack for mistake, fraud, misrepresentation, and duress.[13] In *Old Harbor Native*

---

3. Following a settlement discussion required by Alaska Appellate Rule 221, Hannaman and ICE agreed to dismiss all claims against Paul Crowley, Linda Hiemer, and Crowley & Hiemer, LLC under Alaska Appellate Rule 511(a). The Crowley defendants are therefore no longer parties to this appeal.

4. *Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 104 (Alaska 2001).

5. *Alaska Rent–A–Car, Inc. v. Ford Motor Co.*, 526 P.2d 1136, 1139 (Alaska 1974).

6. *Meidinger v. Koniag, Inc.*, 31 P.3d 77, 82 (Alaska 2001).

7. Unless context requires otherwise (such as when we are referring to Hannaman individually as a witness or participant), we refer to Hannaman and ICE as "Hannaman" when we are referring to them collectively as litigants.

8. The McLeeses argue that the agreement also releases ICE employee Michael Landowski.

Quoting the agreement, the McLeeses argue that the parties intended the release to "inure to the benefit of and shall be binding on themselves, shareholders, officers, directors, agents, employees ... and attorneys."

9. *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.*, 584 P.2d 15, 24 (Alaska 1978).

10. *Alyeska Pipeline Serv. Co. v. Shook*, 978 P.2d 86, 89 (Alaska 1999) (holding that release between employer and employee precluded employee's claims).

11. 852 P.2d 1146 (Alaska 1993).

12. *Id.* at 1152.

13. *See Old Harbor Native Corp.*, 30 P.3d at 105; *Zeilinger v. SOHIO Alaska Petroleum Co.*, 823 P.2d 653, 657–58 (Alaska 1992).

*Corp. v. Afognak Joint Venture,* we held that a settlement agreement and release did not preclude misrepresentation and mutual mistake claims.[14] We distinguished *Martech* by observing that claims for fraud, misrepresentation, and mistake "challenge the validity and effectiveness of the release agreement, not its scope—the issue that *Martech* addresses."[15]

Likewise, the settlement agreement and mutual releases in this case would not necessarily bar Hannaman's claims against the McLeeses if the contracts containing the releases are held to be invalid because Hannaman was induced to enter into them by fraud, misrepresentation, or duress attributable to the McLeeses. Although the agreements provide that Hannaman acknowledged that "Rick L. McLees has tendered all performances due under this Settlement Agreement" and that Hannaman "release[d] Rick L. McLees from any further obligation" and also released Janet McLees "from all claims and causes of action," Hannaman's claims challenge the manner in which the releases were obtained, not the scope of the contracts' provisions.

### C. There Are Genuine Issues of Material Fact About Whether the McLeeses Fraudulently Induced Hannaman To Enter into the Settlement Agreement and Mutual Releases.

Hannaman argues that the superior court erred in granting summary judgment to the McLeeses because he claims that there are genuine issues of material fact about whether the McLeeses made fraudulent statements to induce him to sign the settlement agreement and mutual releases. To support this assertion, Hannaman refers us to his affidavit and to the affidavits of Dean Pratt and Grant Watts.

■ We must first consider whether the affidavits contain admissible evidence for the purposes of satisfying Alaska Civil Rule 56(e). The McLeeses argue that the three affidavits are inadmissible because, they claim, the affidavits contain hearsay and do not "demonstrate competency to testify."[16] We reject this argument. The affiants each described events which they witnessed. Most of the conversations they described were with the McLeeses individually or with the McLeeses' attorney. The McLeeses' statements to Hannaman, Watts, or Pratt would be admissible as non-hearsay admissions by party opponents under Alaska Rule of Evidence 801(d)(2). The McLeeses' attorney's statements would also be nonhearsay under that rule if he spoke for the McLeeses, or under Alaska Rule of Evidence 801(d)(1) if he was available to testify to his own prior statements at trial.[17]

■ We have recognized that a party induced by a fraudulent or material misrepresentation to enter into a contract may be able to avoid the contract.[18] Restatement (Second) of Contracts § 164 (1981) states that a contract is voidable "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying." This statement is consistent with what we have said in the past about this ground for avoiding a contract.[19]

---

14. *Old Harbor Native Corp.,* 30 P.3d at 105.

15. *Id.*

16. *See generally Broderick v. King's Way Assembly of God Church,* 808 P.2d 1211, 1215 (Alaska 1991) ("If the parties choose to submit affidavits [in support or opposition of summary judgment], they must be based upon personal knowledge, set forth facts that would be admissible evidence at trial, and affirmatively show that the affiant is competent to testify to the matters stated.").

17. *See Sopko v. Dowell Schlumberger,* 21 P.3d 1265, 1269–70 (Alaska 2001) (holding that worker's statements to physician were admissible in connection with summary judgment motion as admissions of party opponent).

18. *Cousineau v. Walker,* 613 P.2d 608, 612 (Alaska 1980) (citing Restatement (Second) of Contracts § 306 cmt. a) (Tentative Draft No. 11, 1976) (holding that material misrepresentation, either innocent, negligent, or fraudulent, is adequate ground for avoiding contract).

19. *Bering Straits Native Corp. v. Birklid,* 739 P.2d 767, 768 (Alaska 1987) (holding that stock purchaser could not avoid contract on ground of misrepresentation because purchaser had prior knowledge of misrepresentations and material omissions); *see also Cousineau,* 613 P.2d at 612; *cf. Johnson v. Curran,* 633 P.2d 994, 997 (Alaska 1981) (citing Restatement (Second) of Contracts §§ 301–15) (Tentative Draft No. 11, 1976) (holding that nightclub could not avoid contract on

Per section 164 and our case law, to prove that the McLeeses fraudulently induced him to enter into the releases, Hannaman must show that (1) there was a misrepresentation; (2) the misrepresentation was fraudulent; (3) the misrepresentation induced Hannaman to enter into the contract; and (4) Hannaman's reliance on the misrepresentation was justified.[20] Viewing the evidence in a light most favorable to Hannaman, there are genuine issues of material fact about whether the McLeeses made fraudulent misrepresentations during settlement agreement discussions and thereby induced Hannaman to release all potential claims.

**Issue of Misrepresentation.** Before the parties signed the settlement agreement and releases on November 10, 1998, the McLeeses represented to Hannaman and his attorney that they had returned all of ICE's property, including tools and corporate files, except for a wire cart and a rug, which they promised to return. The McLeeses further represented that they did not have any of ICE's or Hannaman's property in their home, garage, or shed.

Hannaman produced evidence, however, permitting an inference that the McLeeses falsely misrepresented that they had returned all of ICE's and Hannaman's property. The affidavit of Dean Pratt suggests that the McLeeses may have been harboring ICE's property as of October 1998. According to Pratt's affidavit, he and Michael Landowski, another crew member on ICE's projects for Tesoro in Fairbanks, took tools and equipment that were designated for those jobs to the McLeeses' Anchorage home on October 2, 1998. Pratt stated that at Rick McLees's request, Pratt and Landowski "stash[ed]" the tools and equipment at the McLeeses' home. While Pratt was unloading materials, he noticed that the McLeeses' garage and storage shed were filled with electrical tools and equipment. Pratt attested that "Rick McLees told me the tools and materials we were unloading would not be needed to complete the Tesoro projects ... [and that Rick McLees] didn't want Mike

Hannaman to know that he was taking stuff and hiding it." Pratt further attested that when he, Landowski, and Rick McLees returned to Fairbanks, McLees "told Mike Landowski and me that he didn't want Mike Hannaman to know that [McLees] had to reorder materials."

In his own affidavit, Hannaman stated that per the October 2 oral agreement he went to the McLeeses' home to divide the tools used for one of the Tesoro projects. Although Hannaman recovered some of ICE's tools from Rick McLees, McLees refused to let Hannaman inspect the company's utility trailer. When Hannaman returned to pick up additional materials from the Tesoro projects, the McLeeses' garage door was closed and their storage shed was padlocked. Rick McLees gave Hannaman a few other tools and materials, "representing [that these were] the only materials left over from the Tesoro projects."

Although the McLeeses returned some items to Hannaman, there is a factual dispute over whether they still possessed some of ICE's property as of November 10, 1998. For instance, Pratt attested that he unloaded approximately twenty to twenty-five spools of electrical wire, many of which were full spools, at the McLeeses' home. Hannaman attested in his affidavit that as of November 1998, the McLeeses had not returned "full spools of electrical wire," among other things.

The McLeeses also maintained at the November 10 meeting when the parties signed the releases that they had returned all of ICE's corporate files. Hannaman, however, later attested in his affidavit that he had not received some of ICE's corporate documents that the McLeeses had in their possession, including a contract and change order file for the Sisters Island contract and itemized invoices for tools that Rick McLees had purchased on ICE's account. Therefore, drawing all inferences in favor of Hannaman, there is a genuine issue of material fact

basis of fraudulent misrepresentation because it did not produce evidence that it was induced to enter into contract because of misrepresentation).

**20.** *Bering Straits,* 739 P.2d at 768; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 164 (1981).

about whether the McLeeses' November 10 representation that they had returned all of ICE's corporate property was false.

**Issue of Fraudulent Misrepresentation.** Evidence in the record also permits an inference that the McLeeses' alleged misrepresentation was fraudulent.[21] A misrepresentation is fraudulent if it is "consciously false" and "intended to mislead another." [22] There is evidence permitting an inference that the McLeeses knew that their representation was false and that they intended to induce Hannaman into signing the releases. Rick McLees allegedly personally ordered Pratt and Landowski to store the tools and equipment from the Tesoro jobs at his home in October 1998 without Hannaman's knowledge. Rick McLees's apparent awareness that the property did not belong to him is evidenced by his alleged statement to Pratt that he did not want Hannaman to know that he was taking equipment and hiding it at his home or that he was reordering equipment on ICE's account to replace the tools he had taken. Rick McLees's subsequent refusal to let Hannaman inspect the company's trailer or the McLeeses' garage and storage shed for any ICE property also permits a reasonable inference that he may have been knowingly hiding equipment from Hannaman. There was therefore evidence permitting an inference that as of November 10, Rick McLees knew that his representation that he had returned all property to Hannaman was false.

The evidence also permits an inference that the McLeeses intended Hannaman to enter into the contracts in reliance on their representations. Because Hannaman had been trying to recover ICE's property from the McLeeses since approximately July 1998, the McLeeses were on sufficient notice that the return of ICE's property was one of

Hannaman's priorities. Rick McLees's alleged concealment of ICE's tools at his house in October also suggests that he intended Hannaman to rely on his representation that he had returned all of ICE's property.

**Issue of Inducement.** To avoid the releases, Hannaman must show that the McLeeses' alleged misrepresentations induced him to enter into the releases.[23] Hannaman maintained in his affidavit that he agreed to settle with the McLeeses in part because they promised to return his property. When the McLeeses represented to Hannaman that they had returned all of ICE's property before Hannaman and ICE signed the releases, Hannaman's attorney told the McLeeses' attorney, Paul Crowley, in the presence of Rick and Janet McLees that "ICE and Mr. Hannaman were relying upon the representations on the part of Rick and Janet McLees, in regards to signing the [settlement agreement and mutual releases]." Based on this evidence, we can infer that the McLeeses' representations induced Hannaman to enter into the releases.

**Issue of Justifiable Reliance.** Evidence also permits an inference that Hannaman was justified in relying on the McLeeses' representations. Because Rick McLees refused to let Hannaman search his garage or shed or the company trailer, Hannaman was unable to conduct an independent search of the McLeeses' home for ICE's tools and files. There is evidence that the McLeeses reassured Hannaman in October and again on November 10, in the presence of the parties' attorneys, that they had returned everything belonging to ICE and Hannaman. Before signing the agreement and releases, Hannaman was unable to independently confirm the veracity of their representations.

---

**21.** *See Bering Straits,* 739 P.2d at 768; RESTATEMENT (SECOND) OF CONTRACTS § 164 (1981).

**22.** RESTATEMENT (SECOND) OF CONTRACTS § 162 cmt. a (1981); *cf. City of Fairbanks v. Amoco Chem. Co.,* 952 P.2d 1173, 1176 n. 4 (Alaska 1998) (citing *Bubbel v. Wien Air Alaska, Inc.,* 682 P.2d 374, 381 (Alaska 1984) (stating that scienter element of fraudulent misrepresentation damages claim "requires proof that the maker knew of the untrue character of his or her representation")).

**23.** *See Bering Straits,* 739 P.2d at 768; RESTATEMENT (SECOND) OF CONTRACTS § 164 cmt. c (1981) ("No legal effect flows from either a non-fraudulent or a fraudulent misrepresentation unless it induces action by the recipient, that is, unless he manifests his assent to the contract in reliance on it.").

Some courts appear to have held as a matter of law that releasing parties were not justified in relying on representations of the released party made at the time of settlement, at least when the controversy being settled itself alleged fraud or dishonesty.[24] There is authority to the contrary. For example, in *Sims v. Tezak*, the Illinois Court of Appeals, applying Illinois law, held that justifiable reliance is always a question of fact for the jury, even if the parties who executed a broad release relied on representations of a party it had reason to mistrust.[25] In support, it quoted a federal case applying Illinois law:

> Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation, even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another. "[T]he fraud-feasor will not be heard to say that he is a person unworthy of belief, and that plaintiff was negligent in trusting him, and was cheated through his own credulity." [26]

We think it better not to hold as a matter of law that a releasing party is never justified in relying on fact representations of a released party during settlement of claims which accused the released party of fraud or dishonesty. Such a rule would effectively encourage misrepresentations during settlement negotiations in such cases and would potentially chill their settlement.

It would also potentially fail to distinguish between disputes which exclusively involve claims of fraud and dishonesty, and those in which such claims are ancillary or alternative or are the product of overheated pleading. Whether reliance is justified in a given case seems to us more likely to turn on the course of dealings between the parties before and during the dispute. And in this case, it is relevant that the settlement agreement potentially required Rick McLees to do things following the settlement (such as perform punch-list and remedial work on several projects, provide as-built drawings and other things, and provide certain documentation by December 30, 1998). This implies that, notwithstanding claims of fraud or dishonesty, there was sufficient trust that the parties thought they could rely on McLees's future performance of these undertakings.

We conclude that Hannaman is not foreclosed from proving the element of justifiable reliance.

We therefore conclude that there are genuine issues of material fact about whether the McLeeses fraudulently misrepresented facts and thereby induced Hannaman to enter into the settlement agreement and mutual releases, and about whether Hannaman's reliance was justified. We consequently reverse the grant of summary judgment.

■■■■■■ Hannaman also argues that the superior court erred in holding that the McLeeses' alleged misrepresentations were not material.[27] A misrepresentation is material if it would likely induce a reasonable person to manifest his assent.[28] Because we have concluded there are genuine triable is-

**24.** *See, e.g., Metrocall of Delaware, Inc. v. Cont'l Cellular Corp,* 246 Va. 365, 437 S.E.2d 189, 194, 195 (1993) (reasoning that "it is unreasonable to rely on the representations of the allegedly dishonest party").

**25.** *Sims v. Tezak,* 296 Ill.App.3d 503, 230 Ill.Dec. 737, 694 N.E.2d 1015, 1020–21 (1998).

**26.** *Id.* (quoting *Pattiz v. Semple,* 12 F.2d 276, 278 (E.D.Ill.1926)) (internal citations omitted).

**27.** Even if a misrepresentation is not fraudulent, a contract may be voided if the misrepresentation was material. *See Cousineau v. Walker,* 613 P.2d 608, 612 (Alaska 1980) (holding that material misrepresentation, either innocent, negligent, or fraudulent, is adequate ground for avoiding contract); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 164 cmt. b (1981) ("[A] non-fraudulent misrepresentation does not make the contract voidable unless it is material."); *Old Harbor Native Corp. v. Afognak Joint Venture,* 30 P.3d 101, 104 (Alaska 2001); *Diagnostic Imaging Ctr. Assoc. v. H & P,* 815 P.2d 865, 866–67 (Alaska 1991) (addressing claim that non-fraudulent misrepresentations rendered release invalid).

**28.** RESTATEMENT (SECOND) OF CONTRACTS § 162 cmt. c (1981); *see also Cousineau,* 613 P.2d at 613 ("A material fact is one . . . . which could reasonably be expected to influence someone's judgment or conduct concerning a transaction.").

sues whether the McLeeses fraudulently induced Hannaman to enter into the releases, we do not need to decide whether the McLeeses' misrepresentations were material or whether there are genuine factual disputes about their materiality.

Hannaman alternatively also argues that the release was the product of economic coercion. We conclude that Hannaman did not present sufficient evidence to create a genuine issue of material fact with respect to his economic coercion claim.

## IV. CONCLUSION

We REVERSE the order granting summary judgment against ICE and Hannaman, and remand for further proceedings.

BRYNER, Justice, with whom CARPENETI, Justice, joins, dissenting.

The crux of Hannaman's attempt to avoid his settlement is his assertion that the McLeeses fraudulently misrepresented their compliance with the settlement's requirements and induced him to sign through their fraud. In rejecting this claim on summary judgment, the superior court found that the record failed to support it. I would affirm the superior court's ruling.

As today's opinion acknowledges, Hannaman's claim of fraudulent inducement required him to prove four separate elements: misrepresentation, fraud (or at least materiality), inducement, and justified reliance.[1] To withstand the McLeeses' motion for summary judgment, then, Hannaman needed to offer at least some evidence supporting each of these elements. Although the record in this case might be construed to meet Hannaman's threshold burden as to the first three elements, I fail to see how it provides any glimmer of hope on the final element: *justified* reliance.

The undisputed facts before the superior court establish that over the summer of 1998 Hannaman became embroiled in a dispute in which he accused the McLeeses of participating in an ongoing course of fraudulent conduct by concealing and converting his corporate assets—ICE's records, its equipment,

and its work. The McLeeses adamantly denied any wrongdoing, repeatedly asserted that they had no significant corporate property, and consistently refused to cooperate with Hannaman's demands for information. Frustrated by the McLeeses' denial and resistance, Hannaman eventually negotiated an oral agreement to settle his claims on condition that the McLeeses return whatever corporate records and property they had in their possession. The following month, after Hannaman had an opportunity to ensure that the McLeeses met these conditions, the parties formalized their arrangement by signing a detailed settlement contract that mutually released all past and future foreseeable claims. As part of the written settlement contract, Hannaman expressly acknowledged that the McLeeses had performed all their obligations under the agreement. Beyond that, the contract disavowed Hannaman's reliance on representations by the McLeeses and stated that Hannaman had been given ample time to confirm the McLeeses' compliance. Moreover, the contract sought to avert any future allegations that the McLeeses had misrepresented their compliance with the agreement, unequivocally requiring Hannaman to bear the risk of noncompliance: "[T]o the extent that Rick L. McLees has not tendered full and satisfactory performance of all such obligations [under the settlement agreement], Michael Hannaman ... hereby waive[s] and release[s] Rick L. McLees from any further obligation."

Hannaman now seeks to avoid the consequences of this agreement by offering the affidavit of Grant Watts, the attorney who represented him at the time of the settlement. Watts avers that just before the settlement was signed, he asked the McLeeses a series of questions designed to elicit assurances that they had fully complied with the agreement; then, according to Watts, he told the McLeeses' attorney "that ICE and Mr. Hannaman were relying upon the representations on the part of Rick and Janet McLees in regards to signing the [agreement]." Hannaman then signed the settlement contract, whose express terms disclaimed reli-

1. RESTATEMENT (SECOND) OF CONTRACTS § 164 (1981).

ance on any representations by the McLeeses.

Surely a prima facie case of justified reliance requires something more than this. As a matter of law, the terms of the parties' fully integrated written agreement could not have been modified by Watts's unilateral and self-serving oral assertion of Hannaman's intent to rely on the McLeeses' assurances. Nor, as a matter of fact, could Watts's nudge-nudge, wink-wink assertion of intended reliance support a reasonable inference that Hannaman's reliance would be justified given the undisputed language of the settlement contract—particularly its express disavowal of any reliance on the McLeeses' representations.

In fact, it seems hard to imagine any weaker evidence purporting to show that the McLeeses' last-minute assurances caused Hannaman to be justifiably—that is, reasonably—misled into surrendering all future claims against them (including claims for misrepresentation). For if Hannaman genuinely believed the allegations he had himself repeatedly leveled against the McLeeses— over their constant assurances of innocence—during the months preceding the settlement, then it seems fair to wonder how another round of the same assurances moments before signing the settlement agreement could have reasonably induced him to settle. Would any reasonably prudent person in Hannaman's shoes have been misled by the McLeeses' statements? The obvious answer is no. It defies common sense to think that a fair-minded person could infer, on this evidence alone, that Hannaman's reliance was justified.

The basic proposition is simple: Hannaman cannot wilfully blind himself to the telltale presence of potential fraud in settling with the McLeeses, and then plausibly blame the McLeeses for his failure to see it.

Abundant case law joins common sense to support this conclusion. The Virginia Supreme Court, Eleventh Circuit, Florida Supreme Court, Second Circuit, and Indiana appellate courts have all held that justified reliance generally cannot be found when a party who has settled a dispute over alleged dishonesty later claims to have been misled by false assurances of honesty on the part of the allegedly dishonest party.

In *Metrocall of Delaware, Inc. v. Continental Cellular Corp.*,[2] a group of minority shareholders sued a majority shareholder, alleging self-dealing, failure to disclose information, and other fraudulent and dishonest acts. The litigation settled, with all parties executing a general release. The minority shareholders later discovered that at the time of the settlement the majority shareholder did not disclose that it was in negotiations to sell the company. The minority shareholders filed a second lawsuit, alleging that the majority shareholder had fraudulently induced them to settle. But the Supreme Court of Virginia rejected this claim, holding that the minority shareholders' fraudulent-inducement claim failed because they could not justifiably have relied on the majority shareholder's representations at the time of settlement.[3] Observing that the fraud alleged in the second lawsuit was within the scope of the broad release contained in the settlement,[4] the court ruled as a matter of law that "when negotiating or attempting to compromise an existing controversy over fraud, dishonesty, and self-dealing, it is unreasonable to rely on the representations of the allegedly dishonest party."[5]

Two federal cases interpreting Florida law have upheld the same proposition. In *Pettinelli v. Danzig*,[6] the Eleventh Circuit considered a Florida case in which the plaintiff-appellants were investors who settled an unlitigated dispute with a company's officers in which the investors alleged that the officers had fraudulently induced them to invest. The settlement agreement included a release of all claims arising out of actions up to the date of the settlement. The investors later sought to rescind the settlement as fraudu-

2. 246 Va. 365, 437 S.E.2d 189 (1993).

3. *Id.* at 194.

4. *Id.*

5. *Id.* at 195.

6. 722 F.2d 706 (11th Cir.1984).

lently induced. But the Eleventh Circuit ruled that even if the officers had made material misrepresentations, the investors could not justifiably rely on them. The court emphasized that one of the investors was an attorney who should have understood the consequences of the release and that the investors had not insisted on examining the company's books before signing the release. The court therefore affirmed summary judgment for the defendants, holding, just as the Virginia Supreme Court did in *Metrocall,* that in settling a claim of dishonesty or fraud the accusing party may not justifiably rely on the allegedly fraudulent party's representations.[7]

Another Eleventh Circuit decision, *Mergens v. Dreyfoos,*[8] considered a case in which former minority shareholders executed a stock repurchase agreement with the majority; the agreement included a general release clause applicable to all claims accrued as of the day of the agreement. The shareholders claimed that they had been told by the company that it did not contemplate any sales of its assets. The former shareholders then learned the very next day that the company had made a very profitable sale of an asset. The former shareholders sued for fraud. The court noted that before executing the agreement, the plaintiffs had complained that the defendants were mismanaging the corporation and wasting its assets, and had threatened to sue the majority shareholders if they refused to buy back the minority's shares.

The parties thus had a pre-existing adversarial relationship before signing the release, and they signed the release in light of the threatened legal action. Observing that in these circumstances "[a] more untrusting relationship is difficult to imagine," the court concluded that reliance by the plaintiffs was unjustified as a matter of law.[9]

In *Bellefonte Re Insurance Co. v. Argonaut Insurance Co.,*[10] the Second Circuit, applying New York law, considered an analogous claim and reached the same conclusion, holding that "Plaintiffs cannot freely, and for consideration, promise not to sue for failure to disclose material facts and then claim that the promise was fraudulently induced because material information was, in fact, not disclosed."[11]

Indiana follows the same rule. In *Prall v. Indiana National Bank,* for example, the Indiana Court of Appeals found a claim of fraudulent inducement barred in a case arising out of a previously settled claim of fraud, noting that, even if the plaintiff had not disclaimed reliance on the defendant's representations in settling the prior claim, reliance on those representations would not have been justified in an arm's-length settlement negotiated by a represented plaintiff.[12]

A few scattered cases point in the opposite direction, resting their rulings on the proposition that the reasonableness of a plaintiff's reliance always presents a question of fact

7. *Id.* at 710; *see also Mergens v. Dreyfoos,* 166 F.3d 1114 (11th Cir.1999); *Florida Evergreen Foliage v. E.I. DuPont De Nemours Co.,* 135 F.Supp.2d 1271 (S.D.Fla.2001); *Somerset Pharmaceuticals, Inc. Gunster, Yoakley, Valdes–Fauli & Stewart, v. Kimball,* 49 F.Supp.2d 1335 (M.D.Fla.1999); *Hall v. Burger King Corp.,* 912 F.Supp. 1509 (S.D.Fla.1995).

8. 166 F.3d 1114 (11th Cir.1999).

9. *Id.* at 1118; *see also Florida Evergreen Foliage,* 135 F.Supp.2d at 1289–90; *Somerset Pharmaceuticals, Inc.,* 49 F.Supp.2d at 1340; *Hall,* 912 F.Supp. at 1524–25.

10. 757 F.2d 523 (2d Cir.1985).

11. *Id.* at 526 (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 581 F.Supp. 241, 244 (S.D.N.Y.1984)).

12. 627 N.E.2d 1374, 1378–79 (Ind.App.1994); *see also Circle Centre Dev. Co. v. Y/G Indiana, L.P.,* 762 N.E.2d 176 (Ind.App.2002). Courts in other states have reached similar conclusions. *See, e.g., Wender & Roberts, Inc. v. Wender,* 238 Ga.App. 355, 360, 518 S.E.2d 154 (1999) (claim of reliance in dispute involving fraud unjustified as a matter of law because, "[i]n order for a genuine issue of material fact to exist as to justifiable reliance, there must be some evidence that the president and the company exercised their duty of due diligence to ascertain the truth of the matter"); *Davis v. Davis,* 422 Pa.Super. 410, 417–18, 619 A.2d 743 (1993) (rejecting fraudulent inducement claim as a matter of law given adversarial nature of the parties' relationship and fact that claimant was represented by counsel).

for the jury.[13] The court today implicitly follows this minority position, effectively holding that, once the plaintiff produces some evidence of actual reliance, the issue of justification can never be decided on summary judgment. Yet we have declined to follow this categorical view in analogous cases and have generally recognized that issues of fact such as this may properly be resolved on summary judgment if the undisputed evidence would allow a fair-minded person to draw only one reasonable inference.[14]

Moreover, the minority view squarely conflicts with the Restatement. Restatement § 164 describes justified reliance as a factual element that the claimant must prove to avoid a contract on the ground of inducement by fraud. I see no reason to conclude that this issue of fact is immune from being decided on summary judgment when the claimant's own evidence of justified reliance categorically rules out the existence of justification.

Sound policy, too, supports the conclusion that no reasonable inference of justification can arise under the circumstances at issue here. Parties accused of fraud would rarely if ever be encouraged to settle their claims out of court if they knew that the law routinely allowed accusers to set these settlements aside merely by advancing conclusory assertions of unfair inducement by the allegedly fraudulent party's purportedly fraudulent denials of fraud. It might be argued, of course, that the minority view reflected in today's opinion advances the competing goal of protecting the rights of all settling parties to rely on the good faith of their opponents in settlement negotiations. Yet this otherwise laudable goal has anomalous consequences and ultimately proves self-defeating if the presumption of good faith is applied too rigidly to settlements involving accusations of bad faith and fraud; for in this unique setting it inherently tends to operate one-sidedly, and so to preclude settlements, by exposing accused parties, at their accusers' option, to ever-renewable claims of misrepresentation. Because it seems to me that Hannaman has failed to produce any material evidence raising an inference that he justifiably relied on the McLeeses' purportedly fraudulent pre-settlement statements, I would affirm the superior court's order granting the McLeeses' motion for summary judgment.

---

**13.** *See, e.g., Chase v. Dow Chemical Co.,* 875 F.2d 278, 283 (10th Cir.1989); *Sims v. Tezak,* 296 Ill.App.3d 503, 230 Ill.Dec. 737, 694 N.E.2d 1015, 1020–21 (1998); *see also Matsuura v. E.I. Du Pont De Nemours & Co.,* 102 Hawai'i 149, 73 P.3d 687, 701–02 (2003).

**14.** For instance, in *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell,* 956 P.2d 1199, 1203–04 (Alaska 1998), we affirmed the summary dismissal of a claim for negligent misrepresentation when undisputed evidence showed conduct falling outside the scope of the duty allegedly breached; we observed that dismissal on summary judgment was proper on this issue because the undisputed record permitted only one reasonable inference. Hannaman's claim is closely analogous: In *Arctic Tug* the plaintiff alleged negligent breach of a duty when no reasonable inference of the duty's existence arose under the circumstances alleged by the plaintiff; here, similarly, Hannaman claims justifiable reliance when no reasonable inference of justification arises under his asserted facts. *See also Dinsmore–Poff v. Alvord,* 972 P.2d 978, 987 (Alaska 1999).